WALL and another vs. SCHNEIDER.

*January 9 — January 29, 1884.*

*Gambling contracts: Sale of chattels: Future delivery: Evidence.*

1. A contract for the sale of commodities to be delivered at a future time is not void as a gambling contract because *one* of the parties, unknown to the other, intends that there shall be no actual delivery but merely a payment of the difference in price according to the rise and fall of the market; nor because delivery is to be made in warehouse receipts; nor because the buyer is required to put up a margin as security; nor because the contract provides that the measure of damages in case of a breach shall be the difference between the contract price and the market price on the chamber of commerce where the contract is made; nor because

the seller has an option as to the precise time of delivery, he being bound to deliver within a limited period.

2. The evidence in this case, outside of the written contract, is *held* to show conclusively that the seller intended in good faith to deliver the commodities sold.

APPEAL from the Circuit Court for *Milwaukee* County. The case is thus stated by Mr. Justice Cassoday:

"This action is to recover damages for the breach of the following agreement in writing, to wit:

"'Milwaukee, January 24, 1882.

"'14,000 bus. No. 2 Barley, April, at $0.96.

"'In consideration of one dollar, hand paid, *Wall & Bigelow hereby sell and agree to deliver*, and *J. C. Schneider* buy and agree to receive and pay for on delivery, fourteen thousand bushels of No. 2 spring barley, at ninety-six cents per bushel, *to be delivered in current warehouse receipts* of Milwaukee elevators, *at such time in the month of April, 1882, as the seller may elect.* It is mutually agreed that this contract is *subject to the rules and regulations* of the chamber of commerce of Milwaukee, *and the same are hereby made part of this contract.*                    J. C. Schneider.'

"A duplicate of this contract was signed by the plaintiffs at the same time, and delivered to the defendant. The plaintiffs were at the time commission merchants, and members of the chamber of commerce, and did business there. The defendant also did business there, and had an office in the chamber of commerce building, but in fact lived at Hudson. The rules and regulations of the chamber of commerce of Milwaukee, the warehouse receipts, the checks in payment of the barley, the memoranda of sales, book accounts, etc., are all in evidence. At the close of the trial the court directed a verdict for the plaintiffs for the amount of the difference between the contract price and the amount received by the plaintiffs on the contract, and from the judgment entered thereon the defendant appealed."

For the appellant there was a brief by *Frisby & Turner*, and oral argument by *Mr. Frisby*.

*H. M. Finch*, of counsel, for the respondents.

CASSODAY, J.   The statute provides for the punishment of any person who shall lose or win any money, property, or thing in action, by gambling, in any manner or by any means, or by betting upon any future contingent or unknown result or occurrence, in respect to anything whatever.   Sec. 4535, R. S.   So, the statute makes all promises or other contracts (except insurance) void where the whole or any part of the consideration is for money or other valuable thing won or lost, laid or staked, or betted at or upon any game of any kind, or under any name whatsoever, or by any means, or upon any wager, or for the repayment of money or other thing of value, lent or advanced at the time, and for the purpose, of any game, play, bet, or wager, etc.   Sec. 4538, R. S. In the case of *Barnard v. Backhaus*, 52 Wis., 597, it appears, not only from the opinion of the court by the present chief justice, but from the note left by the late chief justice, who participated in that decision and was to write the opinion, that "contracts in writing for the sale and delivery of grain at a future day, for a price certain, made with a *bona fide* intention to deliver the grain and pay the price, are valid in law; but when such contracts are made as a cover for gambling, without intention to deliver and receive the grain, but merely to pay and receive the difference between the price agreed upon and the market price at such future day, they come within the statute of gaming, and are void in law." The ground for holding the note void in that case is stated by the present chief justice, in his opinion, in these words: "It is sufficient to say that the court deems it clearly and satisfactorily proven that in respect to some of the transactions *none of the parties intended* an actual sale and purchase of wheat, but that the whole thing was to be settled by the

payment of differences." Page 603. The writer was not a member of the court when that case was decided, but such being the facts, he apprehends that no one could, under the statute, come to any different conclusion. That case was followed in *Everingham v. Meighan*, 55 Wis., 354, where the judgment was reversed and a new trial ordered because the trial court improperly took the case from the jury and directed a verdict for the plaintiff, when there was some evidence tending to prove that neither party had any *bona fide* intention to deliver and receive the grain at a future day on payment of the price, but merely to pay and receive the difference between the price agreed upon and the market price at such future day. For the same reason the late case of *Lowry v. Dillman, ante*, p. 197, was reversed and a new trial ordered, and the doctrine reiterated "that contracts for the sale and purchase of commodities, where *neither party intends* to deliver or accept the property sold, but where they are merely to pay the difference in price according to the rise and fall in the market, are gambling contracts, and that any security founded on such transaction is void." That doctrine, as there said, will be rigidly enforced in all cases fairly coming within its scope and meaning.

Do the facts here presented bring the case within the scope and meaning of the doctrine thus stated? True, the contract was for No. 2 spring barley, to be delivered in current warehouse receipts of Milwaukee elevators. The issuance of such warehouse receipts without having the property, as therein represented, is severely punishable by statute. Sec. 4424, R. S. When such receipts are issued, as therein provided, they are by statute made transferable by delivery thereof, *without indorsement or assignment*, and any person to whom they are so transferred is deemed and taken to be the owner of the property therein specified, so far as to give validity to any pledge, lien, or transfer made or created by such person. Sec. 4425, R. S. These warehouse receipts

must be understood as applying to private warehouses as well as custom houses or bonded warehouses. *Price v. Wisconsin M. & F. Ins. Co.*, 43 Wis., 267. And they are negotiable, with like effect as to title as negotiable paper for the payment of money. Id., 281. These warehouse receipts are in evidence, and there is nothing to impeach their integrity or genuineness. They must, therefore, each and all, be treated as representing, and held to represent, the amount and quality of barley stated in them respectively.

It is urged that the written contract, with the rules and regulations of the chamber of commerce which are made a part of it, is upon its face a gambling contract, and hence void. In order to so hold we must find, as a matter of fact, that at the time of making the contract the plaintiff had no intention of selling and delivering the warehouse receipts as therein stated, and also that the defendant had no intention of buying or receiving such receipts. Can we so find upon the evidence in this case? True, the contract provided, in effect, that the plaintiff should be secured by a margin of ten per cent. on the contract price, and for an additional margin in case such barley should go down on the market; and also provided a summary way for closing out the transaction in case the defendant failed to pay the money and take the warehouse receipts at the time designated. But this does not seem to be enough, especially when taken with the other evidence in the case, to authorize a finding that neither party intended to perform the contract. Under one of the rules of the chamber of commerce, made a part of the contract, a failure on the part of the plaintiffs to deliver the warehouse receipts, as agreed in the contract, on the receipt of the price, would have subjected them to suspension and expulsion from the chamber of commerce. By another rule the defendant, by making default in the payment of the money and receiving the warehouse receipts for the space of one month, subjected himself to being barred from any

right to representation upon the floor of the chamber of commerce for any business, object, or purpose whatever. Thus the rules and regulations contemplated the enforcement of the contract, as well as the putting up of margins and the settlement of differences. True, the rules provide, in effect, that in case of the default of either party, such party shall be liable to the other for the difference between the contract price and the price at which the property has been sold or bought (as the case may be); but that is only so as a consequence of a breach, and in order, in that event, to constitute and fix the rule and measure of damages against the party so in default. But such could only be the result in case of default. In the absence of such default and in case of performance by both parties no such consequence could occur.

Of course, the power to make contracts implies the power to break contracts. A necessary incident of breaking a contract is liability to the other party for the breach. The amount of damage must necessarily depend upon the nature of the contract and the extent of the breach. In an executory sale of a commodity having a fluctuating market value, the amount of the damage must necessarily depend upon the state of the market at the time of the breach. Is the contract in question to be condemned as illegal, merely because it provided, in effect, that in case it should be broken by either party the measure of damages should be the differences between the contract price and the price on the chamber of commerce at the time of the breach? Assuming that such price on the chamber of commerce at the time of such breach would be the true market value, then it is manifest that the amount of damages thus stipulated for was precisely the measure of damages which the law would have given for such breach, without any stipulation. *Hill v. Chapman, ante*, p. 211. True, the rules prohibit members of the association from gathering within or adjacent to the

chamber of commerce, before or after regular business hours, and forming a market for the purpose of making any trade or contract for future delivery, but they also provide that nothing therein shall be construed as authorizing extortionate claims based on values manipulated for the purpose of securing such claims. Had the stipulation been for some extravagant or entirely fictitious measure of damages, instead of being substantially for the damages fixed by law, there would have been great force in the contention of counsel for the defendant.

Of course, the law prohibits speculation in mere differences in such contract and market values, for that is a contract whereby there is, in fact, no agreement to perform, but where there is actually reserved to the seller or buyer the privilege or option of delivering or receiving the article contracted for or not. *Wolcott v. Heath*, 78 Ill., 437. It is against such fictitious transactions that the penalties of the law are directed. *Ibid.; Gregory v. Wattowa*, 58 Iowa, 711. But a contract for such mere differences, made with the intent that no property shall pass except in the mere payment of such difference, is an entirely different thing from a stipulation for a rule of damages in case of the breach of a contract in which both parties not only expressly agreed in writing to perform, but at the time of making the contract honestly expected and intended to perform. In the one case such difference is the sole and exclusive subject and object of the contract. *Kingsbury v. Kirwan*, 77 N. Y., 612. In such case there is an absence of any *bona fide* intent to deliver the article and receive the price, or to receive the article and pay the price. In the other case there is the present *bona fide* intent to deliver the article and receive the price, and to receive the article and pay the price, and when such is the nature of the contract and the intention of the parties, it should not be rendered invalid merely because it contains a stipulation for a measure of dam-

ages in case of a breach which is substantially the same as would have been given by law. It seems to be settled that where a contract for future delivery is valid in its inception, and not tainted with any gambling intent, the mere fact that at the time for its fulfilment, instead of delivering and receiving the article according to the terms of the contract, one of the parties makes default, and thereupon the parties settle on the basis of actual differences in the contract price and the market value at the time of the breach, does not render the contract void as a gambling contract. *Brua's Appeal*, 55 Pa. St., 294; *Smith v. Bouvier*, 70 Pa. St., 325; *Fureira v. Gabell*, 89 Pa. St., 89; *Clarke v. Foss*, 7 Biss., 540; *Gilbert v. Gaugar*, 8 Biss., 214; *Williar v. Irwin*, 11 Biss., 57; *Sawyer v. Taggart*, 14 Bush, 727.

The mere fact that delivery was to be made *at such time in* April as the *seller might elect* for the price stipulated, did not make the contract invalid upon its face. The mere option of the seller to elect the particular day in the month upon which to make delivery did not relieve him from his obligation to deliver during the month. The seller being still under obligation to deliver, the contract was not different in principle, in this respect, from ordinary executory contracts to deliver at a future day, and "such contracts," as stated by this court in *Barnard v. Backhaus*, "are constantly made in legitimate transactions, and are unobjectionable in law." *Cole v. Milmine*, 88 Ill., 349. Thus it has been repeatedly held that where the only option the seller has is as to the precise time of delivery, and the legal effect of the agreement is that the delivery must be made within a limited period, the contract is not thereby rendered illegal. *Pixley v. Boynton*, 79 Ill., 353; *Logan v. Musick*, 81 Ill.; 415; *Bigelow v. Benedict*, 70 N. Y., 204; *Story v. Salomon*, 71 N. Y., 420; *Harris v. Tumbridge*, 83 N. Y., 99.

Nor does the mere fact that the contract authorized the seller to exact margins as security make the contract illegal

within the authorities, if it was otherwise valid. *Hatch v. Douglas*, 48 Conn., 116; *Corbett v. Underwood*, 83 Ill., 324; *Union Nat. Bank v. Carr*, 15 Fed. Rep., 438.

But although the contract in question did expressly stipulate for actual performance, and did not expressly make such differences the exclusive subject or object of the contract, still it does not necessarily follow that the contract was not for a fictitious transaction, but was made with a *bona fide* intention on the part of the seller to deliver the article and receive the price, and on the part of the buyer to receive the article and pay the price. For, as stated in the opinion in *Barnard v. Backhaus, supra,* "it will not do to attach too much weight or importance to the mere form of the instrument, for it is quite certain that parties will be astute in concealing their intention, and the real nature of the transaction, if it be illegal. It may safely be assumed that parties will make such contracts valid in form; but courts must not be deceived by what appears on the face of the agreement. It is often necessary to go behind or outside of the words of the contract — to look into the facts and circumstances which attended the making of it — in order to ascertain whether it was intended as a *bona fide* purchase and sale of property, or was only colorable."

Here the evidence, outside of the written contract, removes all possible doubt as to the real intention of the plaintiffs. That testimony is undisputed, and to the effect that they intended all the while to deliver according to the contract; that they never at any time had any intention of not delivering; that they actually purchased the requisite warehouse receipts before the time of delivery, and held them for the defendant to the time of delivery. The evidence is also undisputed, and to the effect that early in March, 1882, and only a few weeks after making the contract, the defendant informed the plaintiffs that he expected to take the barley when deliverable, notwithstanding his

financial embarrassments. So, the testimony is conclusive that the defendant informed the plaintiffs by telegraph, as early as March 18, 1882, that he expected to take the barley, and on the same day he wrote his banker in Milwaukee to that effect, and therein tried to negotiate with him for the money with which to pay for it. So, the testimony is conclusive that March 31, 1882, he instructed his agent in Milwaukee, by letter, to the effect that he wanted the bank to pay for the 14,000 bushels of barley, and that if the market was oversold there would be some show, if he held it a few days, to sell with a loss; but if the bank should not want to take care of it a few days, *then he better sell it as fast as it was delivered,* and that he would send his draft for the loss. So, the evidence is undisputed that the barley mentioned in that letter is the barley in question; that on the receipt of that letter by the defendant's agent, and on April 1, 1882, he called upon the plaintiffs, and inquired if they had the barley ready for delivery in case he made arrangement with the bank to pay for it; and was then informed that they had in their possession the warehouse receipts, which were then handed to the agent for inspection; that thereupon the agent tried to arrange with the bank for the money with which to pay for the barley, as indicated in the letter, but failed to do so; and thereupon the agent went upon the floor of the chamber of commerce and sold the barley, as directed in the letter, and then delivered his card to the plaintiffs, showing that he had sold to W. P. McLaren & Co., 7,000 bushels, at eighty-nine cents per bushel; to the same, 5,000 bushels, at eighty-eight and three fourths cents per bushel; to Zinkeisen, Bartlett & Co., 1,000 bushels, at eighty-nine cents per bushel; and to Asmuth & Krause, 1,000 bushels, at eighty-nine cents per bushel; and thereupon the plaintiffs delivered the warehouse receipts to such purchasers, and at the same time received from them, respectively, payment for the amount of such sales, and credited the same to the defendant on the purchase price.

From all these undisputed facts it would seem that the defendant also intended to take the barley according to the contract. But notwithstanding these facts, the defendant testified, in effect, that although he could not tell anything about the intention of the plaintiffs, yet it was his intention to sell out the barley at a profit,— to sell the option he had on the barley,— and that he did not expect to receive any actual barley on the contract. This language is, to say the least, equivocal and of doubtful import. Just how he could sell out the barley at a profit without, in effect, receiving the barley does not appear. Under the contract proven, he had no option on this barley to sell. His business under the contract was simply to receive and pay. The only way he could sell out the barley at a profit, or any option upon it, was by way of some new contract of which we have no evidence. The fact that he intended to sell it indicates that he expected it would be delivered, and that he intended to receive it. If he, in fact, at any time had an intention not to receive the barley, then we must assume from the evidence that he kept such intention a secret, for there is no claim that he so informed the plaintiffs, or any one; besides, such intent would be in direct conflict with his declaration, made in the fore part of March, his telegram and letter of March 18th, and his letter of March 31st. If the case turned upon the defendant's intention alone, then, possibly, it would have been proper to have submitted the case to the jury. But we are not aware of any adjudicated case going to the extent of holding that such mere secret intention of one party to the contract, not communicated to the other party, is sufficient to invalidate such contract. In *Barnard v. Backhaus, supra,* it was "clearly and satisfactorily proven that, in respect to some of the transactions, *none of the parties* intended an actual sale and purchase of the wheat." As indicated by this court in *Lowry v. Dillman, supra,* it is only "where *neither party* intends to deliver or accept," that the contract is illegal. To the same effect are *Murry v. Ocheltree,*

59 Iowa, 435; *Clarke v. Foss, supra; Williar v. Irwin, supra; Sawyer v. Taggart, supra; Williams v. Carr,* 80 N. C., 294; *Williams v. Tiedemann,* 6 Mo. App., 269; *Roundtree v. Smith,* 108 U. S., 269; *Grizewood v. Blane,* 73 Eng. C. L., 541. In *Murry v. Ocheltree, supra,* it was held that although the defendant intended simply to gamble on the fluctuations of the markets, yet since the evidence showed affirmatively that the transaction on the part of the plaintiffs was a *bona fide* sale of grain to be actually delivered at a future time, they were entitled to recover.

Assuming that the defendant's testimony, as to his not intending to receive and pay for the grain, is not consistent with his other statements, and not in conflict with his declaration, telegram, and letters, yet as such intention was never communicated to the plaintiffs, but remained a secret, and as it appears from the undisputed evidence that the plaintiffs made the contract with the *bona fide* intention of delivering the warehouse receipts and receiving the price as agreed in the contract, we must hold, upon the authorities cited and in harmony with the uniform rulings of this court, that the plaintiffs are entitled to recover. It follows that, upon the evidence given, the court was justified in directing a verdict for the plaintiffs.

This terminates the real controversy, and obviates the necessity of considering several exceptions taken. It only seems necessary to add that we are clearly of the opinion that the defendant's agent was authorized, by the letter he received, to sell the barley as he did, and, having sold it, and the defendant having received the benefit of such sale by way of credit for the amount it brought, on his account, he is in no position to escape liability for the balance of the damages resulting from the breach of his contract, by claiming that the sales so made to McLaren & Co. and others were void, under the statute of frauds.

No material evidence seems to have been excluded. The

right to go outside of the written contract was conceded by the trial court, and the rulings upon the admissions of evidence were upon that theory. Without going into details, we must say that the trial court seems to have admitted all testimony having any legitimate bearing upon the real issues in the case. The rules of evidence are familiar to the profession, and it is hardly necessary to go into renewed discussion whenever an exception is taken which merely involves questions which have become elementary.

*By the Court.*— The judgment of the circuit court is affirmed.

ORTON, J., dissents.