# Jennings, Appellant, v. Morris.

*Contract—Gambling contracts—Futures—Merchandise.*

Merchandise such as grain, cotton and oil may legally be bought and sold upon speculation, and the purchase may be with borrowed money, or upon credit, and with or without security; and the legality is not affected if the purchaser pledges the merchandise to secure the payment of the purchase money. The transaction, however, becomes illegal if in fact it is the intention of the parties only to pay or receive the difference between the contract prices and the future market prices without the delivery of the subject of sale.

The legal presumption is that the transactions were not contrary to law, and the burden is upon him who asserts the contrary to prove their illegality.

Where the testimony is conflicting the intention of the parties may be gathered from the course of dealing.

Argued Jan. 25, 1905. Appeal, No. 261, Jan. T., 1904, by plaintiff, from order of C. P. No. 1, Phila. Co., June T., 1900, No. 358, dismissing exceptions to referee's report in case of Edmund P. Jennings v. William McK. Morris and Edwin J. Morris, trading as Morris & Co. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT and ELKIN, JJ. Affirmed.

Assumpsit for balance due on purchases and sales of cotton by plaintiff for defendants' account.

The case was referred by agreement to E. Hunn Hanson, Esq.

From the referee's report it appeared that the plaintiff was a cotton broker in Philadelphia, and the defendants were manufacturers of cotton at Yardville, New Jersey. The defendants. had for four or five years bought cotton through the plaintiff. During the year 1900 the defendants gave plaintiff orders to buy many thousand bales of cotton. These orders were filled and subsequently on a marked decline on the price of cotton, and on the failure of defendants to furnish sufficient margin the cotton was sold, resulting in a loss, for which this suit was brought. The referee after stating the facts reported as follows :

The principle governing the facts is distinctly established by decisions in Pennsylvania: Peters v. Grim, 149 Pa. 163, and Assigned Estate of L. H. Taylor & Co., 192 Pa. 304. It may be stated as follows :

Merchandise (grain, cotton, oil, etc.,) may legally be bought and sold upon speculation and the purchase may be with borrowed money or upon credit and with or without security ; and the legality is not affected if the purchaser pledges the merchandise to secure the payment of the purchase money ; or, in other words, he may engage the pledgee (his broker or another) to " carry it," to use the commercial phrase, and this —further to adopt the current word—either with or without part payment of the purchase money, " the margin."

But the transaction becomes illegal if instead of this it is the intention of the parties shown by their course of dealing merely to pay or receive the difference between the contract prices and the future market prices without the delivery of the subject of the sale.

In the case for decision the plaintiff testified he had every reason to believe, did believe, and expect that the cotton for the purchase of which he had the defendants' orders would be taken by them ; that is to say, that the contract was to be perfected by delivery ; and that in the case of every purchase he tendered the cotton to the defendants. E. J. Morris, on the contrary, testified that the dealings in futures were gambling transactions pure and simple, although on cross-examination

he seemed reluctant to repeat this and very much modified it.

In view of this contradiction, such as it is, what the intention of the parties was must be determined from such of their acts and course of dealing as manifested it.

The legal presumption is that the transactions were not contrary to law: Bibb v. Allen, 149 U. S. 481 (13 Sup. Ct. Repr. 950); Clews v. Jamieson, 182 U. S. 461 (21 Sup. Ct. Repr. 845), and the onus of proving they were so was upon the defendants. This they sought to do from the plaintiff's statements of account of futures rendered them; the significance of these is only developed when compared with the plaintiff's bills for cotton that was delivered. In all such bills the cotton was either designated by marks and the weight of each bale, or of the entire amount sold; so many bales a month were to be delivered at the defendants' mills and the terms for which the note in payment was to be given were specified and subsequently the cotton sent each month was weighed at the mill and the plaintiff advised of this in detail.

In the statements of account with regard to the transactions in dispute, the cotton was not designated either by marks, number or weight; and since these statements showed that not only the purchases, but also the sales of the same merchandise were in the hands and under the control of the plaintiff, it was doubly businesslike if bales were delivered that they should be so described that the defendants might verify the accuracy of what was stated to have taken place.

These statements of account are such as would be rendered if no more was intended than a settlement of differences between the contract and market prices; there are so many bales bought, the same number sold at the same time, and the difference in price designated as profit or as loss, as the case may be. The presumption of legality was in this manner rebutted by evidence, and it thereupon fell to the lot of the plaintiff to establish by further evidence, if practicable, the legality of the contracts with the defendants. This was undertaken by the letters which in each case he wrote to the defendants stipulating that in such transaction actual delivery was understood and intended and by his testimony that he tendered the cotton to the defendants and that they assured him they were buying

to load up with cheap cotton to protect themselves from an expected trust combination.

Undoubtedly the letters must be deemed as the stipulation of each party that actual delivery of cotton was intended. But each knew doubtless that dealings in mere differences were wagers and illegal, and knowing this each might naturally choose to cover the illegality by a seeming legal contract. Passing that as of no great moment, however, it is clear that notwithstanding the plain written assertion that actual delivery was intended, such intention might be given up for another, and that it was abandoned by the course of dealing is shown by the difference between bills rendered for cotton bought and delivered and statements of cotton futures before pointed out. Although the testimony of the plaintiff that he always tendered to defendants the cotton he bought for their account was denied by no more than an inference from E. J. Morris' testimony, yet the statement itself was insufficient to establish an offer to deliver so many bales of cotton, inasmuch as it failed to show that plaintiff had the control of and could have made actual delivery of the cotton tendered, in failing to designate the locality of such cotton or the production of the books of the warehouse, in which it was, or any explanation why this was not done. It is determined, therefore, that whatever the plaintiff meant by the assertion that he tendered the cotton, it did not establish the fact that he controlled it so that he could actually deliver. Finally that part of the plaintiff's testimony to the effect that the parties intended actual delivery because defendants wanted to load up with cheap cotton seems plainly inconsistent with the established fact that the defendants required or permitted the plaintiff to sell all that he bought and to do so within a few weeks or months of each purchase. The testimony intended to re-establish or to maintain the presumption in favor of legality failed of its purpose; and this it is thought becomes further evident by a comparison of these dealings with the more common but analogous ones in stock. As is generally known, when stocks are bought upon margins, and the purchasing broker carries the stock, he actually buys for his customer the shares, takes them to a bank or trust company, there pledges them to obtain the greater part of the funds with which to pay their cost. With respect to margin transac-

tions in merchandise (where they are not mere settlement of differences between the contract and the market price) the broker buys for his customers' account the grain or cotton, generally stored in a warehouse, obtains a negotiable warehouse receipt, pledges it with a bank or company having money to loan, and so gets the greater part of the money with which to pay the price of the merchandise. In such, or some similar way, the plaintiff would have had control of cotton if he had, in fact, purchased bales for the defendants' account, and in such case could readily have established in this suit that he had the means to perfect the tender of cotton which he said he had made.

It was urged that the defendants under the writing with respect to actual delivery could have legally compelled it, that therefore the plaintiff has a similar right with regard to them. If one might do so, the other certainly could. But had the defendants sought by suit to compel delivery, the plaintiff had it in his power successfully to defend, on the ground of illegality of contract (if a sense of business adherence to a contract did not prevent), and yielding in such a suit would have been a voluntary and not a compulsory act.

It remains to consider the persuasive, the potent, appeal of the attorneys for the plaintiff that E. J. Morris, having admitted that his firm received from the plaintiff large profits in dealings in 1899, exactly analogous to those which he characterized as gambling in this suit in order to escape the payment of losses, and the evidence having demonstrated that if the plaintiff had declined to stand by an agreement with the defendants, as they were now doing with him, he would have saved himself the loss of over $8,000, it would be in a high degree unjust to allow the defense to prevail, and that the testimony of E. J. Morris was evasive, at times contradictory, at others incredible, and that his manner of giving it was suggestive of withholding that which he knew, and therefore every intendment should be made against him. If the decision which has been reached depended upon his testimony, a critical review of it would be proper. But as has appeared the conclusion arrived at depends upon the evidence alone of the course of dealing of the parties.

Among men of the business world, and in the market place,

if any answer could be made to this appeal on behalf of the plaintiff it is unknown to the referee. The only one which he can make is that which his office compels, and it is to say that the contract under consideration intended no more than wagering, which, in a court of law, is illegal, and the illegality is not affected by the heavy hardship which in this case follows in its train.

The plaintiff in the game in which the defendants were playing with him believed they would play according to rule and in fairness; accordingly he felt he was justified instead of appropriating the proceeds of two notes of $2,742.15 and $3,190, which the defendants' letters of May 19, 1900, directed to be used to renew two others in another way, and to the then very heavy indebtedness of the defendants to him. Whatever might have been his right in this behalf had such indebtedness been the result of legal dealings, he had not the right to use the proceeds of these notes with regard to an indebtedness resulting from the mere settlement of differences, and accordingly from the misappropriation he is indebted to the defendants in $5,932.15, with interest from July 24, 1900, to the date of this report.

Pursuant to the foregoing the decision of the referee is that the contract between the plaintiff and the defendants concerning futures required the mere settlement of differences between the contract price of cotton and its market price, did not intend the delivery of cotton and is illegal, and that the claim of the plaintiff pursuant to his statement is not recoverable from the defendants.

Exceptions to the referee's report were dismissed by the court.

*Errors assigned* were in dismissing exceptions to referee's report.

*Henry J. Scott*, with him *Ruby R. Vale* and *Alexander & Magill*, for appellant.

*John G. Johnson*, with him *J. W. Bayard*, for appellee.

PER CURIAM, May 1, 1905:

The learned referee in the court below reviewed the evi-

dence with great care, and found as a fact, evidently with reluctance arising from the dishonesty of the defense, that the transactions out of which the plaintiff's claim arose were wagering agreements not enforceable at law. To the facts thus found he applied the law with entire accuracy, and after a most careful examination we are forced to sustain his conclusions.

Judgment affirmed on the report of the referee.