# ERNEST F. KING *vs.* ZELL & MERCERET.

*Evidence—Appeal—Purchase of Stocks on Margin—Presumption as to Validity of Transaction—Failure of Broker to Sell Shares of Stock When Directed—Instructions to the Jury.*

When a witness testifies that the defendant told him that he had made a certain statement to one of the plaintiffs, and the defendant had not then been a witness, such evidence is not in conflict with Code, Art. 35; sec. 3, which provides that it shall not be competent for a party to the cause, who has been examined therein as a witness, to corroborate his testimony when impeached by proof of his own statement made to third persons out of the presence of the adverse party.

When the record does not contain the answer of a witness to a question which had been allowed and excepted to, this Court cannot determine whether the allowance of the question was reversible error or not,

In an action by a stock broker to recover for advances made and losses incurred in the purchase of stocks on margin for the defendant, the presumption is that the contract was valid, and the burden is on the defendant to show that it was a gambling transaction, and that the parties did not intend that the stocks should be delivered.

When the defendant, for whom the plaintiff had bought shares of stock on margin, directs the plaintiff to sell the same at a certain time, which order was not executed, and there is no evidence to show what was the market value of the shares at that time, the jury cannot determine what loss if any, was sustained by the defendant through the failure to execute the order. Consequently a prayer instructing the jury that in such case the plaintiff cannot recover for advances made and losses incurred in the purchase of the stocks for the defendant is erroneous.

If a stock broker fails to obey the instructions of a customer as to the sale of stocks being carried on a margin, he is liable only for the actual loss sustained by reason of such failure.

When a stock broker bought certain shares of stock for the plaintiff on margin, which with the latter's consent were partly converted into other shares and partly sold, and the uncontradicted evidence is that the broker actually purchased the shares, then in an action by him to recover the price paid for the stock less amounts from time to time received, the defendant is not entitled to have the jury instructed that unless they find that the stocks mentioned were actually purchased by the plaintiff, and were in his possession ready to be delivered to the defendant upon payment of the balance of the purchase money, the verdict must be for the defendant.

*Decided April 2nd, 1907.*

Appeal from the Baltimore City Court (WRIGHT, J.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*George R. Willis* and *James McEvoy, Jr.* (with whom was *Dallett H. Wilson* on the brief), for the appellant.

*Frank Gosnell* and *W. G. Bowdoin, Jr.* (with whom was *James McElroy* on the brief), for the appellees.

SCHMUCKER, J., delivered the opinion of the Court.

The appellees Zell & Merceret, who are stock brokers, obtained a judgment in the Baltimore City Court against the appellant Dr. E. F. King, for a balance due for certain stocks purchased for him, and he took the present appeal therefrom. The record contains four bills of exceptions, two to rulings on evidence and two to the Court's action on the prayers.

There is evidence in the record tending to prove the following facts. On January 25th, 1900, Zell & Merceret purchased on margin for Dr. King, 10 shares of Cotton Duck common stock, and on February 8th, they purchased in the same manner for him 20 shares of Guardian Trust Company stock. While these stocks were being carried on margin the corporations which had issued them were merged into other companies with the result that nine shares of the Cotton Duck common stock were converted into six shares of stock of the U. S. Cotton Duck Company and the twenty shares of Guardian Trust Company stock were converted into ten shares of Maryland Trust Company stock, and the remaining one share of Cotton Duck common stock was sold. Zell testified that King consented to these conversions and sale of stock and King denied consenting to them, but admitted that he had acquiesced in them, after they had been made, and continued to put up margins with Zell & Merceret for carrying the converted stocks, and received credit on his account for the dividends declared on them. Statements of account,

eleven in all, of the dealings between the parties in reference to these stocks were from time to time rendered by Zell & Marceret to King who received them and made no objection to their contents.   On these statements, some of which appear in the record, King was charged with the price paid for the stock and interest thereon, and was credited with the amounts from time to time paid by him on account and interest, and a balance was struck.

The Maryland Trust Company stock, which represented the Guardian Trust Company stock that had been purchased at a cost of $126.58 per share, amounting in the aggregate to $2,531.70, declined heavily and Zell & Merceret made successive demands upon King for additional margin thereon. For a time he responded to these demands, putting up in all $750. of margins in addition to the dividends credited to him, but thereafter he failed to respond to any further demands. Zell & Merceret thereupon, after giving notice to King, sold the Maryland Trust stock and credited the account with the proceeds of sale and sued King in the Baltimore City Court for the balance due on the account and recovered the judgment from which the present appeal was taken.

Zell and Merceret both testified positively that the stocks involved in the account were actually purchased at the Stock Exchange in Baltimore, in which they held a membership, and paid for by them for the account of King, and Merceret testified explicitly that the firm were ready at all times to deliver the certificates to King and would have done so at any time upon receipt from him of the balance due them thereon, and their testimony was uncontradicted.

King testified that Merceret before he went into the firm of Zell & Merceret, had frequently solicited and obtained from him orders for bucket shop dealings in stocks and that he (King) had indulged in bucket shop stock transactions with several different parties, but in none of those ventures had there been any actual purchases of the stocks.   He said: "I had it with several men of that kind in what they call bucket shops, but I never dealt in any regular board way before on

the exchange; that is the first I ever had in that way." King also testified that after he had put up all the money he could spare as margins he went to Zell & Merceret's office and told Mr. Zell that he (King) had put up money enough on this thing, that it was no good and further said to him: "I want you to sell it at the market price." He (Zell) replied: "It is suicidal to try to sell out at any such price as this, it is outrageous to think of doing so. I said I do not care whether it is outrageous or not, I want it sold and I ain't going to put up any more money; I don't want it any longer; he said we are not going to sell it, but will carry it; I said then you will carry it at your own expense and I went out." King said this occurred a few days after he paid the last $100 on October 1st, 1903. There is no evidence in the record showing what was the market price or the value of the stock at that time.

Merceret when on the stand was asked in cross-examination whether he had any conversation with King after the purchase of the Guardian Trust stock and if so what King said. The witness replied: "He said to me one day he met me on the street, he said Frank I came to your office to see you but you were not about. He seemed very much worried at the time Dr. King was; he said I gave Mr. Zell the order to sell my Maryland Trust stock and he said that it would be suicidal and not to do it that he would carry it." The Court upon motion of the plaintiff struck out this answer and its action in so doing forms the subject of the first exception.

The appellees in support of their objection to this answer rely mainly on sec. 3 of Art. 35 of the Code which in part provides as follows:   *   *   "Nor shall it be competent in any case for any party to the cause who has been examined therein as a witness to corroborate his testimony when impeached by proof of his own declaration or statement made to third persons out of the presence and hearing of the adverse party."   *   *

But there was here no attempt on the part of King to corroborate his own testimony for he had not yet gone upon the stand when the answer of Merceret was made. We think the

answer should not have been stricken out but the defendant was not injured by the Courts action as he himself testified fully as to what he told Zell to do with the stock and Merceret later on in his testimony said without objection, that King told him that he had told Zell what to do with the stock.

The second exception was to the Court's overruling the objection of the defendant and allowing Zell when on the stand to answer the question whether he had said to King that he would carry the stock at his own risk when King told him to sell it. The answer to the question if there was any answer does not appear in the record and we cannot therefore say whether it tended to injure the defendant or not. It may be observed in this connection that Zell elsewhere in his testimony denied that any interview between him and King in reference to the sale of the stock ever occurred.

At the close of the case the plaintiffs offered the two following prayers both of which the Court granted.

1. "The plaintiffs pray the Court to instruct the jury that there is no evidence in this case legally sufficient to show that when the orders to buy the stocks mentioned in the evidence were given by the defendant to Merceret, one of the plaintiffs, said transactions were understood and intended by the parties to be a dealing in the rise and fall of the market prices of said stocks and that the stocks were not intended by them to be bought in fact for delivery to the defendant, and that the difference in the rise and fall of said market prices of said stocks and the profits and losses, as the case might be, was to be settled and adjusted between the plaintiffs and the defendant by the payment by the plaintiffs to the defendant of the amounts of any rise in the market prices of said stocks and by payment by the defendant to the plaintiffs of the amounts of any losses on account of any fall in the market prices; that is to say, the jury are instructed that said dealings between the parties were not gaming or waging transactions, and the jury are further instructed that there is no evidence in the case legally sufficient to show that said transactions were other than *bona fide* and lawful business transactions."

2. "The plaintiffs pray the Court to instruct the jury that even though they may find from the evidence that the defendant directed the plaintiffs in the month of October, 1903, to sell his ten shares of Maryland Trust Company stock, and that the plaintiffs failed or neglected to execute such order, there is no evidence in the case legally sufficient to show that the defendant suffered or sustained any pecuniary loss or damage by reason thereof."

There was no error in granting either of these prayers. We have already referred to the positive testimony of Zell & Merceret that the stocks were actually bought and paid for and carried by them. That testimony is uncontradicted. Even King did not undertake to say that he intended these stock purchases made through Zell & Merceret to be merely fictitious and not actual ones, or to be mere deals in the rise and fall of the market prices of the stocks, the losses or profits to be adjusted between the parties. The law presumes the validity of the contracts and the burden of proof to show that they were mere gambling contracts is upon the defendant. *Dryden* v. *Zell & Merceret*, decided by this Court Nov. 16th, 1906, 104 Md. 345.

The second prayer is correct, because there being no evidence in the record of the market value of the stocks at the time of the alleged order to sell them the jury could not determine what if any loss was suffered by the defendant through the failure to execute the order, if they should find that the order had in fact been given.

The defendant offered the following three prayers which the Court rejected.

1. "The defendant prays the Court to instruct the jury that if the jury shall find that the transactions between the plaintiffs and the defendant were intended to be dealings in the rise and fall of the market prices of the stocks, and the same were not to be delivered; but the differences between the prices on the day of the purchase and the prices on the day of settlement to be adjusted, then the plaintiffs cannot recover."

2. "That if the jury believe from the evidence that the de-

fendant gave to the plaintiffs an order to purchase the stocks mentioned in the account in this case, and that the defendant upon the receipt of a demand on behalf of the plaintiffs for the payment of further margin and that the defendant called upon the plaintiffs and declined to make any further payment and directed the plaintiffs to sell the stocks and the plaintiffs declined to so sell the stocks and did not sell the same in accordance with the direction of the defendant, then the plaintiffs cannot recover in this case."

3. "That unless the jury believe from the evidence that the stocks mentioned were actually purchased by the plaintiffs, and were in the possession of the plaintiffs from the date of the purchase of the same, and ready to be delivered to the defendant upon the payment of the balance of the purchase-money therefor, their verdict must be for the defendant."

The plaintiffs excepted specially to each one of the defendants prayers. They excepted to the first for want of legally sufficient evidence to support its hypothesis or to show that the stock transactions between the plaintiffs and defendant were intended to be mere dealings in the rise and fall of the market price of the stocks. They excepted to the defendant's second prayer.

(1) For want of evidence legally sufficient to support its hypothesis, and

(2) Because there is no evidence in the case to show that the market value of the stocks referred to at the time the alleged order to sell the stocks was given was any higher or greater than the market value of the said stocks at any period subsequently thereto, and

(3) Because there is no evidence in the case to show that the defendant suffered any damage by reason of the failure of the plaintiffs to execute the order for the sale of the stocks alleged to have been given by the defendant to the plaintiffs.

They excepted to the third prayer because it ignores the sale of one share of Cotton Duck common stock and the conversion of the remaining nine shares of that stock into six shares of U. S. Cotton Duck stock and the merger of twenty

shares of Guardian Trust stock into ten shares of Maryland Trust stock, and the alleged order of the defendant to the plaintiff to sell the stocks.

There was no error in rejecting the defendant's first and third prayers. Nor was there error in rejecting his second prayer, unless it be the. law as contended by the appellant that the failure of a broker to execute an order to sell stocks which he is carrying for a customer instead of making him responsible to the customer for any loss caused by his failure to execute the order, releases the customer from liability to him for loss incurred in carrying the stocks before the order to sell was given. We are aware of no authority to support that contention. The cases of *Zimmerman* v. *Heil*, 33 N. Y. Sup., affirmed in 156 N. Y. 703, *Rogers* v. *Wiley*, 131 N. Y. 527, and *Jones* v. *Marks*, 40 Ill. 313, cited by the appellant in that connection do not support it. On the contrary they treat contracts between stock brokers and their customers like contracts between other persons and support the sound and rational doctrine that a customer in an action against his broker for failure to obey his instructions can only recover the actual loss which he has sustained by reason of such failure.

Finding no reversible error in the rulings of the learned Judge below we will affirm the judgment appealed from.

*Judgment affirmed with costs.*