W. M. BELL COMPANY, Appellant, vs. EMBERSON and others, Respondents.

*December 12, 1923—January 15, 1924.*

*Contracts: Gaming: Sales for future delivery: Validity: Unlawful intent: Burden of proof.*

1. One ordering the purchase of grain on a particular chamber of commerce impliedly agrees to be governed by the rules and regulations of that body.  p. 441.
2. Even if the dealings between the parties were on margins, it would not invalidate an otherwise valid contract.  p. 443.

3. Contracts in writing for the sale and delivery of grain at a future day for a price certain, made with a *bona fide* intention to deliver the grain and pay the price, are valid, and delivery may be made by means of warehouse receipts.    p. 444.

4. It requires an unlawful intent shared by both parties at the time of the making to invalidate such a contract, and the court may look ·into the facts and circumstances attending the contract to find whether it is *bona fide* or merely colorable. p. 444.

5. Sec. 2319*a*, Stats., sanctions sales for future deliveries, and does not invalidate such contracts because at the time of the contract the vendor was not the owner of the property sold, or because one of the parties did not intend performance, but preserves the right to impeach the contract for fraud, for want of consideration, or because a wagering contract was intended.    p. 445.

6. When the illegality of a contract or other transaction is relied on as a defense, the burden of showing the illegality rests on the one asserting it, in the absence of some confidential relation.    p. 447.

7. In the case of a contract of sale for future delivery, valid on its face, it must be shown by the person who attacks it as void that there was no intention to deliver the article sold and that nothing but the difference between the contract and the market price was intended to be paid; and in this case it is *held* that the defendant has not met the burden of proof. p. 448.

APPEAL from a judgment of the circuit court for Trempealeau county:.E. C. HIGBEE, Circuit Judge.    *Reversed.*

Certain stockholders in the Ettrick Elevator Company petitioned the court to appoint a receiver to wind up the affairs of that corporation.    A receiver was appointed, and thereafter there was filed, among others, the claim of *W. M. Bell Company,* commission merchants, amounting to $2,714.95.    The receiver filed objections to the allowance of this claim.

The Ettrick Elevator Company was organized in 1920, the articles of incorporation being filed in the office of the secretary of state on February 13th.    The capital stock was $50,000, divided into shares of the par value of.$100. Fifty per cent. of the capital stock was not subscribed and the company never acquired a legal corporate existence by

which it could do business with other than its members. The corporation took over the elevator and business of the Ettrick Elevator Company (a copartnership) which had been organized in 1918, and many of whose members became stockholders in the corporation.

In February, 1920, the Elevator Company was given a line of credit up to $5,000 with the *Bell Company.* The *Bell Company* was secured by a promissory note for $5,000 executed by the Elevator Company and indorsed by certain of the stockholders. Thereafter the Elevator Company drew on the *Bell Company* for various sums, so that at all times after February 3, 1920, the Elevator Company was indebted to the *Bell Company* for disbursements made on its account.

From time to time the Elevator Company shipped grain to the *Bell Company* to be sold on account of the Elevator Company. These grains were sold and the proceeds credited to the account of the Elevator Company. The *Bell Company,* a member of the board of trade of Milwaukee, charged the Elevator Company with commissions for the sale of the grain, and also charged interest on the balance due that company as shown by the account from month to month. These shipments of grain continued until August, 1921, and were of a value in excess of $25,000. At that time the *Bell Company* claimed a balance due from the Elevator, Company of $2,714.95.

The receiver objected to the allowance of four items of the account of the *Bell Company,* amounting to $1,080.55, on the ground "that the consideration of said indebtedness represents moneys advanced and used in trading in options and speculative ventures on the board of trade."

The circumstances surrounding these transactions are as follows:

On August 24, 1920, the Elevator Company instructed the *Bell Company* to sell for its account on the floor of the Milwaukee Chamber of Commerce 1,000 bushels of wheat to be delivered in December. On September 13, 1920, the

Elevator Company sent instructions to buy 1,000 bushels of wheat to be delivered in September. Because of a rising market a loss of $181.98 was incurred and this was charged to the account of the Elevator Company.

On August 24th the Elevator Company directed the *Bell Company* to sell for its account 1,000 bushels of rye to be delivered in September. On September 3d the *Bell Company* was directed to buy the same amount of September rye. On this transaction a loss of $60.38 was charged to the Elevator Company.

On October 9, 1920, the *Bell Company* received instructions to buy 3,000 bushels of oats for the Elevator Company, to be delivered in May, 1921. On May 2, 1921, the *Bell Company* was instructed to sell 3,000 bushels of May oats. A loss of $765.97 was then charged to the Elevator Company.

On the last mentioned date the Elevator Company ordered 3,000 bushels of oats to be bought for July delivery. On June 30th 3,000 bushels of July oats were sold on account of the Elevator Company, and a loss of $72.22 was charged against it.

It appears from the testimony of Hage, manager of the Elevator Company, that when he instructed the *Bell Company* to sell the December wheat and September rye the Elevator Company had wheat and rye ready for shipment. The following appears in the testimony of Hage:

"*Q.* At the time you directed the purchase of 3,000 bushels of May oats, did you have a *bona fide* intention of accepting delivery of these oats? *A.* No. This transaction was finally closed by the sale of 3,000 bushels of May oats by the *Bell Company* on the board of trade."

"*Q.* At the time you bought these oats you intended it should be closed in that manner? *A.* Yes."

It further appears from the testimony of this witness that the board of directors of the Elevator Company authorized him to make the purchase of May oats.

As to the purchase and sale of the July oats, he testified

that at the time of the purchase he intended in good faith to accept delivery. He testified further:

"In all of these transactions I intended and expected at the time that they were made on the board of trade that they would be closed by a sale or purchase, as the case might be, on the board of trade."

On October 11, 1920, shortly after the purchase of 3,000 bushels of May oats, the following letter was sent to the Elevator Company:

"In compliance with your wire instructions, we bought 3M May oats for you as per the inclosed memo.

"The market ruled strong and higher. The movement shows signs of falling off and it is apparent that the country is holding back, not being satisfied with prevailing prices. This applies to all grains. It looks as if some reaction may take place, but it is well not to get too bullish in the face of the very large crop of grain that has been harvested and which will be pressing on the market."

On May 2, 1921, the following letter was sent by the *Bell Company:*

"We wrote you a number of times in regard to the May oats which you have bought through us. We understand that deliveries will be very heavy and we may possibly have to take these in tomorrow for your account. Presume it is not your intention to carry these, as the cost of insurance, storage, etc., is a very large item. We suggested to you some time ago that if you wished to transfer them into July or September to advise us. We have not had any definite instructions from you. Would suggest that you wire us on receipt of this letter."

On the following day the *Bell Company* telegraphed the Elevator Company: "Your May oats delivered in store. Wire disposition." On the same day the following notice was received by the *Bell Company* from the office of the Chamber of Commerce Clearing Association:

"*W. M. Bell Co.:* We have on hand ready for delivery the following described warehouse receipts, and hereby make tender to you of the same, in fulfilment of our con-

tract of sale to you of 3,000 bushels No. 2 white oats at 35½."

One Hottensen, an employee of the *Bell Company*, testified that in a sale of oats for delivery in May the vendor had the option to deliver the oats, or warehouse receipts, at any time during the month of May; that on May 3d he was notified that warehouse receipts covering 3,000 bushels of oats were ready to be delivered to him; that he had instructions from the Elevator Company, shortly before they were to be delivered, to sell 3,000 bushels of May oats; that accordingly he made the sale, but that no credit for the money received was entered on the account of the Elevator Company for the reason that he sold the receipts, and in settling his account with the Chamber of Commerce he only paid the difference between the cost price of the oats and the sale price, $765.97, and charged that amount to the Elevator Company. He testified that in each case of a purchase or of a sale of grain for delivery at a future date by the Ettrick Elevator Company through the plaintiff, there was a written confirmation by the plaintiff mailed and duly received by the Elevator Company. The form of this confirmation was as follows:

"All orders executed by us are subject to the conditions printed hereon.
"Ettrick Elevator Company, Ettrick, Wis.
"W. M, BELL COMPANY,
"Commission Merchants.
"United States Food Administration License Number G–35834.
"W. M. Bell Co.                    Milwaukee . . .
"We have this day made the following transactions for your account:

| BOUGHT. | SOLD. |
|---|---|

"All transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor.

"On all marginal business we reserve the right to close transactions when margins are running out without giving further notice.

"We also reserve the privilege of substituting other parties as principals with you in the above trades at any time until closed in accordance with the rules governing the trade at place where contract is made.

"All purchases and sales made by us for you are made in accordance with and subject to the rules, regulations, and customs at the place contract is made."

The trial court found:

"That as to the item in said account charged for loss sustained in the sum of $765.97 on the purchase of 3,000 bushels of May oats, and the item in said account charged for loss sustained in the sum of $72.22 on the purchase of 3,000 bushels of July oats, both of said transactions having been executed by the said *W. M. Bell Company* on the floor of the Milwaukee Chamber of Commerce, it was the intention of the Ettrick Elevator Company, and the parties directing said sale, to gamble on the market price of oats, and that it did not intend to accept actual delivery of said grain, but merely intended such transactions as wagers on the future market price of such grain; and that although said Ettrick Elevator Company did not inform said claimant that it intended only to gamble, the *W. M. Bell Company*, from all the facts and circumstances, had actual knowledge that the said Ettrick Elevator Company, by and in such transactions with it, intended to so in fact gamble, and did not intend to receive delivery of said oats, but intended to settle the difference between the contract and the market price of such commodity so contracted for."

As to the transactions in wheat and rye the court found in favor of the *Bell Company*. The claims of certain other creditors were allowed. The judgment read as follows:

"It is ordered and adjudged that the plaintiffs, Bank of Ettrick, *W. M. Bell Company*, and Chenoweth Brothers, do have and recover of the defendants above named the total sum of $11,217.39, and that they have execution therefor against the separate property of each and every of the defendants above named, and that the sum or sums realized

upon such execution or executions shall be paid to said plaintiffs *pro rata,* according to the amounts adjudged to be due them, respectively, as aforesaid, until said amounts are fully satisfied and discharged."

Other facts will be stated in the opinion.

For the appellant there was a brief by *Kaumheimer & Kenney* of Milwaukee, and oral argument by *R. I. Kenney.*
*W. S. Wadleigh* of Galesville, for the respondents.

JONES, J.. It is argued by counsel for defendant that the finding of the court that the transactions in question were gambling contracts is supported by the testimony of defendant's manager and the documentary evidence referred to in the statement of facts.

According to the testimony of the manager he did not intend that there should be actual delivery of any of the grain bought or sold, although his testimony as to the rye and wheat sales was quite inconsistent. His testimony as to his personal intention was at least rather unsatisfactory as showing the intention of the defendant company. The only instance in which the subject seems to have been considered by the board of directors was in the case of their order for the purchase of 3,000 bushels of oats.

The witness testified that the policy of the board of directors was against transactions of this kind. No record of the corporation authorizing the transactions was offered in evidence, and none of the directors was called as a witness.

Defendant secured a line of credit from plaintiff, carried on numerous transactions, admitted to be legal, on the basis of that credit; does not question the authority of the manager, and directed one of the purchases now questioned; but seeks to avoid that and other transactions of similar character because of the purely personal intention of its manager.

The trial court found that, although the defendant company intended to gamble on the market price of oats, it did

not inform the plaintiff of such intention, yet found that from all the facts and circumstances the plaintiff knew and shared that intention. Counsel for defendant argue that the letters and telegrams justify the conclusion that both parties were engaged in gambling transactions.

When defendant ordered the purchase of grain on the Milwaukee Chamber of Commerce it impliedly agreed to be governed by the rules and regulations governing that body. *Bartlett v. Collins,* 109 Wis. 477, 85 N. W. 703. According to some of those rules and the practice, an order to sell grain to be delivered in a given month entitles the seller to make delivery on any day of that month at his election. According to the practice, when grain is bought for delivery no physical delivery in Milwaukee or at the residence of the buyer is necessary. It may be made in cars, but is more often effected by means of warehouse receipts on grain stored in Chicago ready for actual delivery if required. If default is made by the purchaser, according to the rules he must pay the loss; that is often adjusted by a sale or purchase in the market of a like quantity of grain, which closes the transaction and avoids the penalty which might follow.

It was the testimony on the part of plaintiff that they deliver all grain they sell in some form or other; that the sale by them contemplated the actual delivery of grain whether they purchased a like amount which should be delivered later, or whether they made actual delivery of the grain. According to the custom, delivery of the warehouse receipts is made through the Chamber of Commerce Clearing Association, and it is not necessary for one who has purchased grain for future delivery to himself tender the receipt to the purchaser, as that is handled through the clearing house, where a record is kept.

Counsel for defendant construe the letter of October 11th as showing that plaintiff had knowledge of defendant's intention to wager on market values. This was sent soon

after filling the order to buy 3,000 bushels of oats.    There had already been transactions between the parties in buying and selling grain which the court found to be legitimate. The term "bullish" is no doubt in constant use among commission merchants or others dealing largely in grain, although to the uninitiated it may be suggestive of mere speculation. We think that the letter may be as reasonably construed as a caution not to invest heavily in a falling market as showing knowledge by plaintiff of any unlawful intention of defendant. It certainly was not an encouragement to engage in betting on the market.

Counsel for defendant also interpret the letter of May 2, 1921, as weighty evidence tending to show plaintiff's knowledge of defendant's unlawful intention. The defendant had not given instructions in reply to letters notifying them that provision for the grain to be delivered in May should be made. That delivery in the form of warehouse receipts was soon expected, and was made on the following day, and a telegram to that effect was sent. In reply defendant ordered a purchase of July oats in their place.

In addition to the telegram, plaintiff wrote a letter in part as follows:

"It was a foregone conclusion that heavy deliveries of oats would be made in view of the liberal stocks in Chicago. We understand that several million were delivered. As we understand it, you have these oats as a hedge against stored oats which have been sold out and, of course, in that event you will want to hold them until such a time as you buy the oats that have been sold out."

Owing to the heavy depreciation in the market price after the order had been made and executed there was a material loss which must be borne by one of the parties. It was arranged for in a manner customary in the Chamber of Commerce with the consent of the defendant. We do not consider that the letter criticised by defendant's counsel,

when construed with the undisputed facts, bears out the construction sought to be given it.

There is also criticism of a transaction by which on April 1, 1921, plaintiff made a transfer of $1,000 from the car account to the "Ettrick Elevator Company, future account," and it is claimed that this is evidence that the dealings were on margins. Plaintiff's explanation was that this transfer from the open account was made so that interest might be charged and to show that the credit account had been reduced. Even if this change in the form of the account were to be treated as a margin, that would not invalidate an otherwise valid contract. *Wall v. Schneider,* 59 Wis. 352, 360, 18 N. W. 443; *Hatch v. Douglas,* 48 Conn. 116; *Corbett v. Underwood,* 83 Ill. 324; *Union Nat. Bank v. Carr,* 15 Fed. 438; *Wagner v. Engel-Millar Co.* 144 Wis. 486, 129 N. W. 392.

The principal contentions of defendant's counsel relate to the purchase and sale by which a loss of $765.97 was incurred. The later transaction in which there was a loss of $72.22 was evidently for the purpose of closing up the former ones.

On the part of the plaintiff the testimony was that the company had no knowledge of any intention on the part of the defendant not to accept or make deliveries of any of the grain according to their contracts and that the plaintiff intended to make and accept the deliveries. Unless the letters and telegrams which have been referred to disclose the unlawful intent of the parties, there was no written evidence of that character. The parties do not seem to have had oral communication and there was no oral testimony showing collusion between the managers of the two companies.

Much testimony was given as to the rules and customs of the Chamber of Commerce in adjusting accounts by the Clearing House Association when grain was delivered by

means of warehouse receipts. It does not seem necessary to state this evidence in detail. There are certain general rules with respect to contracts of this kind which have been followed in this state and in other states for many years.

"Contracts in writing for the sale and delivery of grain at a future day, for a price certain, made with a *bona fide* intention to deliver the grain and pay the price, are valid in law; but when such contracts are made as a cover for gambling, without intention to deliver and receive the grain, but merely to pay and receive the difference between the price agreed upon and the market price at such future day, they come within the statute of gaming, and are void in law." *Barnard v. Backhaus,* 52 Wis. 593, 597, 6 N. W. 252, 9 N. W. 595.

Such contracts through boards of trade are not necessarily invalid although actual physical delivery is not expected, and the delivery may be made by means of warehouse receipts. *Wall v. Schneider,* 59 Wis. 352, 355, 18 N. W. 443. Such contracts are not invalidated by reason of the secret unlawful intent of one of the parties. *Wall v. Schneider,* 59 Wis. 352, 18 N. W. 443; sec. 2319a, Stats.

The unlawful intent must be shared by both parties to the contract. That unlawful intent must exist, not after losses have been sustained or gains made, but at the time when the contract is made. *Wall v. Schneider, supra.*

In ascertaining whether such contracts are valid the court is not concluded by their written terms, but may look into the facts and circumstances attending them to find whether they were *bona fide* or merely colorable. *Wall v. Schneider, supra.*

In the consideration of cases of this character the legislative policy must not be overlooked. In 1883 the following statute was enacted:

"No contract for the future purchase, sale, transfer or delivery of personal property shall be void when either party thereto intends, in good faith, to perform the same; and an intention on the part of either not to perform any

such contract shall not invalidate it if the other party shall in good faith intend to perform the same. No such contract shall be void because the vendor was not, at the time it was made, the owner of the property contracted to be sold; and in any action by either party for the enforcement of its terms or to recover damages for a breach thereof it shall be incompetent to show in defense, by any extrinsic evidence, that such contract had any other intent or meaning than it expresses; and it and all collateral contracts, agreements or securities growing out thereof or of which they may have formed the consideration in whole or in part shall be legal and valid; provided, that nothing herein shall be construed to exclude evidence of fraud in the procuring of any such contract as is first mentioned herein, or of any collateral contract, agreement or security growing out thereof, or that any such contract was not entered into upon sufficient consideration, or is not supported thereby, or that both parties intended to make a wagering contract." Sec. 2319a, Stats.

It will be observed that in condensed form this statute expresses some of the rules which had previously been declared by the courts. It sanctions sales for future delivery; does not invalidate such contracts for the reason that one of the parties does not intend performance, or because the vendor was not at the time of the contract the owner of the property contracted to be sold. It preserves the right to impeach the contract for fraud; to show want of consideration; and that a wagering contract was intended.

Before the enactment of that statute it was held that, in actions like the present, "to uphold such a contract it must affirmatively appear that it was made with an actual view to the delivery and receipt of the grain and not as an evasion of the statute of gaming, or as a cover for a gambling transaction." *Barnard v. Backhaus,* 52 Wis. 593, 6 N. W. 252, 9 N. W. 595.

In an opinion by Mr. Justice WINSLOW rendered after the passage of the statute, in a very brief discussion of the subject, this decision was quoted and followed as authority

for placing the burden of proof on the party asserting the validity of the contract. It was said in the opinion:

The rule "is based on the well known fact that a very large majority of the transactions on such boards are not real transactions but simply betting on future prices." *Bartlett v. Collins,* 109 Wis. 477, 85 N. W. 703.

At that time the court consisted of five Justices, and Mr. Chief Justice CASSODAY and Mr. Justice DODGE dissented on the question of burden of proof. In the full discussion of the subject by the Chief Justice he reviewed the peculiar circumstances under which the decision in *Barnard v. Backhaus, supra,* was written, and expressed the opinion that it did not support the view that contracts of this character are presumptively wagering contracts. He cited a large number of cases from other jurisdictions showing that outside of this state the overwhelming weight of authority supported the contrary rule.

It is unnecessary to here repeat those citations, and we only cite a few of the many later cases of the same character: *Jones v. Ames,* 135 Mass. 431; *Jennings v. Morris,* 211 Pa. St. 600, 61 Atl. 115; *Allen v. Caldwell, Ward & Co.* 149 Ala. 293, 42 South. 855; *Overbeck v. Roberts,* 49 Oreg. 37, 87 Pac. 158; *King v. Zell,* 105 Md. 435, 66 Atl. 279; *Pelouze v. Slaughter,* 241 Ill. 215, 89 N. E. 259; *Clews v. Jamieson,* 182 U. S. 461, 21 Sup. Ct. 845; *Bond v. Hume,* 243 U. S. 15, 37 Sup. Ct. 366.

It is undoubtedly true that the great majority of contracts made through the agency of boards of trade are gambling contracts; that thousands of persons every year enter into such contracts fancying that they can foresee the trend of the world's markets better than their fellows, and have their awakening when compelled to pay their losses.

On the other hand, a vast amount of important and legitimate business is carried on every day through the agency of boards of trade. Speculation is not necessarily gambling, and contracts to be consummated on boards of trade, if in-

W. M. Bell Co. v. Emberson, 182 Wis. 433.

tended to be carried out in good faith, are as legitimate as the innumerable other contracts made in the business world in which gains or losses may depend on changes in market values.

"When there is an impression that the price of a commodity is likely to rise, dealers in that commodity will make these time contracts, as they are called, in order to profit by the anticipated rise. Persons may and do purchase wheat in advance because they believe there will be a rise of price in the markets of the world, in consequence of scarcity, or some unusual demand. They may and do speculate in regard to future prices of this and other commodities, oftentimes, as has been said, exhibiting in their speculations great forecast and ability, and much knowledge of business affairs; and, so long as their engagements are entered into with the intention that the subject matter of the contract shall be delivered and received in good faith, courts uphold their agreements." *Barnard v. Backhaus,* 52 Wis. 593, 598, 6 N. W. 252, 9 N. W. 595; *Wall v. Schneider,* 59 Wis. 352, 18 N. W. 443; *Board of Trade v. Christie G. & S. Co.* 198 U. S. 236, 25 Sup. Ct. 637; *Clews v. Jamieson,* 182 U. S. 461, 21 Sup. Ct. 845.

It is too familiar a rule to require citation of authorities that where fraud or negligence is alleged the burden rests upon the one asserting it. The same rule applies in the absence of some confidential relation when the illegality of a contract or other transaction is relied on. *Hale v. Haselton,* 21 Wis. 321; *State ex rel. Hopkins v. Olin,* 23 Wis. 309; *St. Croix Co. v. Webster,* 111 Wis. 270, 87 N. W. 302; *American S. M. Co. v. Jaworski,* 179 Wis. 634, 192 N. W. 50.

According to the overwhelming weight of authority in other jurisdictions the same rule governs in cases of the character now before us. The statute above quoted sanctions sales for future delivery. It states no rule as to the burden of proof, but makes no provision that the usual rule as to the burden of proof shall not prevail.

After careful consideration we have come to the conclusion that in the case of a contract of sale for future delivery, valid on its face, it must be shown by the person who attacks it as void that there was no intention to deliver the article sold and that nothing but the difference between the contract and the market price was intended to be paid. Applying this test, we conclude that the defendant has not met the burden of proof which the law imposes.

It is probable that the trial court was influenced, and properly influenced, by the former decisions of this court, and it is possible that otherwise there would have been a different result.

Some objection is made by counsel for appellant to the form of the judgment, but we do not consider that objection well taken. It was suggested during the oral argument that some part of the claim had been paid after judgment was entered. It is our conclusion that the claim of the appellant should be allowed by the court, less such payment, if any.

*By the Court.*—Judgment reversed, and the cause is remanded to the circuit court with directions to enter judgment in accordance with the opinion.