## Case No. 17,761.

### WILLIAR et al. v. IRWIN.

[11 Biss. 57.] [1]

Circuit Court, D. Indiana. Nov., 1879.[2]

Authority of Partner — Milling Business — Purchases for Future Delivery — Wages — Contracts — Custom among Commission Merchants.

1. If one member of a firm of millers permits his co-partner to hold the firm out to the world as dealers in grain, and knowingly allows cards and letter heads to be used indicating such business, he will be liable with his co-partner on contracts for the sale or purchase of grain for future delivery, though such contracts are made without his actual knowledge, by his co-partner in the firm name.

2. A contract for the sale or purchase of grain for future delivery, legitimate on its face, cannot be held void as a wagering contract, merely by showing that one of the parties so understood it. To render it void it must be proved that both parties regarded it simply a wager on differences.

[Cited in Ward v. Vosburgh, 31 Fed. 13.]
[Cited in Wall v. Schneider, 59 Wis. 359, 18 N. W. 446.]

3. If a purchase or sale of grain for future delivery made in the form of a contract, is in fact simply a bet or wager on differences, the form it assumes does not affect its invalidity.

[Cited in Ward v. Vosburgh, 31 Fed. 13.]

4. A custom among commission merchants on a board of trade by which, if A sells for

¹ [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]
² [Reversed in 110 U. S. 499.]

one of his customers a certain quantity of grain for future delivery to B, who buys the same for one of his customers, and B then for another customer sells the same quantity for like delivery to C, who buys for one of his customers, and C afterwards for another customer sells the same amount for same delivery to A, who buys for another one of his customers—the commission merchants A, B and C can reciprocally surrender or cancel the contracts themselves, adjusting the differences in price, and returning margins, and each substitute his buyer customer and seller customer as parties to the contract, himself guaranteeing the performance of such contract—such a custom is founded in commercial convenience and is valid.

Baker, Hord & Hendricks and George A. Knight, for plaintiffs.

McDonald & Butler and Isaac M. Compton, for defendant.

The following authorities were cited by counsel: Gregory v. Wendell, 40 Mich. 432; Bailey v. Bensley, 87 Ill. 556; Oldershaw v. Knoles, 4 Bradw. [Ill. App.] 63; s. c. 6 Bradw. [Ill. App.] 325; Nourse v. Prime, 4 Johns. Ch. 490; s. c. 7 Johns. Ch. 85; Horton v. Morgan, 19 N. Y. 170; Stewart v. Drake, 46 N. Y. 450; Worthington v. Tormey, 34 Md. 182; Price v. Gover, 40 Md. 102.

GRESHAM, District Judge (charging jury). This is an action brought by the plaintiffs against the defendant as surviving partner of the firm of Irwin & Davis to recover an alleged balance due from said firm to the plaintiffs. The transactions out of which it is claimed this balance grew were certain sales of wheat for future delivery claimed to have been made by the plaintiffs as commission merchants at Baltimore for Irwin & Davis on the order of this firm.

The defenses are: First—That the alleged sales of wheat were not within the scope of the partnership business of Irwin & Davis; that they were the individual transactions of Davis with the plaintiffs; and, second—That the sales were wagering contracts and void.

And first, were the transactions out of which grew the alleged balance due to the plaintiffs, within the scope of the partnership business of Irwin & Davis? Irwin & Davis were partners in the purchase and manufacture of wheat into flour. To this extent the defendant Irwin admits that there was a partnership. He testified that the partnership was limited to this, and that his partner, Davis, who managed and carried on the business, had no authority to buy and ship grain to Baltimore or elsewhere on the firm account. The firm of Irwin & Davis was formed, Irwin says, as early as March, 1873, and it existed under the active management of Davis until his death in October, 1877. It is not denied that during all this time Davis did buy and ship grain to some extent in the firm name. Necessary conveniences existed in connection with the mill, for the loading of grain into cars for shipment. The letter and bill heads of the firm during all this time were "Irwin & Davis, Millers and

Grain Dealers, Brazil, Indiana," and Davis regularly entered upon the books of the firm, transactions in the purchase and shipment of grain.

If you believe that the purchase and sale of grain was within the apparent scope of the partnership, and the parties dealt with Irwin & Davis in good faith, believing they were dealing with the firm, then the firm became liable for such transactions. If Irwin permitted Davis to hold himself and Irwin out to the world as partners in the business of dealing in grain, he became liable with Davis on contracts for the sale and purchase of grain for future delivery, and in that case it is not material that Irwin should have actual knowledge of particular sales or purchases in the firm name. And if Irwin knew that Davis was holding the firm out as dealers in grain, and did not protest or give public notice to the contrary, he is responsible as partner for all contracts made by Davis in the firm name, within the apparent scope of the business of dealing in grain. If Davis, as partner, did in fact buy and sell grain, and if in his correspondence with customers and others, including the plaintiffs, he employed printed letter heads or cards representing the firm of Irwin & Davis as grain dealers; this was a holding out of that firm as a partnership engaged in that business, and if before or at the time of the dealings with the plaintiffs, Irwin knew that the firm was thus held out as grain dealers, he is liable as a partner. If therefore, you believe from the evidence, that Irwin & Davis held themselves out as dealers in grain, as well as in flour, and that plaintiffs dealt with Davis, supposing they were dealing with the firm, and in so doing advanced them any money in fulfilling such contract, you should find for the plaintiffs in whatever sum the evidence may show them to be entitled to on account of such advancements, unless you think the defendant has shown that the transactions between the plaintiffs and Irwin & Davis were gambling transactions.

If you find that the dealings with the plaintiffs were within the scope of the partnership, you will next consider whether the dealings were gambling transactions. The burden of showing that the parties were carrying on a wagering business and were not engaged in legitimate trade or speculation rests upon the defendant. On their face these transactions are legal, and the law does not, in the absence of proof, presume that parties are gambling. A person may make a contract for the sale of personal property for future delivery which he has not got. Merchants and traders often do this. A contract for the sale of personal property which the vendor does not own or possess but expects to obtain by purchase or otherwise, is binding if an actual transfer of property is contemplated. A transaction which on its face is legitimate cannot be held void as a wagering contract by showing that one party only

so understood and meant it to be. The proof must go further and show that this understanding was mutual—that both parties so understood the transaction. If however at the time of entering into a contract for the sale of personal property for future delivery, it be contemplated by both parties that at the time fixed for delivery the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager and nothing more.

It makes no difference that a bet or wager is made to assume the form of a contract. Gambling is none the less such because it is carried on in the form or guise of legitimate trade. It is not sufficient for the defendant to prove that Irwin & Davis never understood they were to deliver wheat in fulfillment of the sales made for them by the plaintiffs. The presumption is that the plaintiffs expected Irwin & Davis to execute their contracts—expected them to deliver the amount of grain sold, and before you can find that the sales were gambling transactions and void, you must find from the proof that the plaintiffs knew or had reason to believe that Irwin & Davis contemplated nothing but a wagering transaction, and acted for them accordingly. If the plaintiffs made sales of wheat for Irwin & Davis for future delivery, understanding that these contracts would be filled by the delivery of grain at the time agreed upon, Irwin & Davis are liable to the plaintiffs, even though they meant to gamble and nothing more.

The testimony tends to show that a general custom obtained among grain commission merchants in Baltimore to the following effect: When one commission merchant upon the order of a customer, sells to another commission merchant a quantity of grain for future delivery, and it occurs that at some other time before the maturity of the contract the same commission merchant receives an order from another customer to purchase the same or a larger quantity of the same kind of grain, for the same future delivery, and he executes this second order by making the purchase from the same commission merchant to whom he had made the sale in the other case, that then in such case the two commission merchants meet together and exchange or cancel the contracts as between themselves, adjusting the difference in the prices between the two contracts and restoring any margins that may have been put up; and that from that time forth, the first commission merchant holds for the benefit of the customer for whom he sold the order or contract of the purchaser for whom he bought, so that the grain of the selling customer may, when delivered, be turned in on the order or contract of the purchasing customer, and that the commission merchant is held responsible as guarantor to his customer.

The evidence also tends to show a custom obtaining among commission merchants in Baltimore to the further effect that though

the second transaction may have been had with a different commission merchant from the one with which the first transaction was had, yet where it can be found that a series of contracts are in existence for the sale of like grain, for like delivery, so that the seller owes the wheat to the buyer to whom he sold, and he to another, who owes like wheat for like delivery to the first commission merchant, that then, in such case they settle by what they call "a ring"—that is, they all reciprocally surrender or cancel their contracts, adjust differences in price between themselves, and surrender all margins that have been put up; that in all such cases the commission merchant substitutes the contract of another customer in place of that with the commission merchant whose contract has been cancelled or surrendered; and that he guarantees to his customer the performance of the contract originally made in his behalf.

I say to you gentlemen that these customs are founded in commercial convenience; that they are not in contravention of the law, and that they are valid. In determining what the intention of the parties was in these transactions, you will carefully weigh all the evidence. Henry D. Williar, one of the plaintiffs, testifies that the plaintiffs expected Irwin & Davis to execute their contracts by delivering the amount of wheat sold. It seems that the plaintiffs sold for Irwin & Davis, for delivery in about two and a half months, 165,000 bushels of wheat. Did Irwin & Davis expect to deliver this amount of wheat within this time? Did the plaintiffs expect Irwin & Davis to enable them to deliver this amount of wheat within the time fixed for delivery? In this connection you will consider the previous dealings between Irwin & Davis and the plaintiffs, the ability of Irwin & Davis to engage in transactions of this magnitude, and the opportunity which the plaintiffs had had to know the extent or character of the business of Irwin & Davis and their financial standing and ability, and the importance of Baltimore as a grain market.

There remains a set-off, gentlemen, and if you find that, in legitimate dealings between the firm of Irwin & Davis and the plaintiffs, there was a balance in the hands of the plaintiffs, which balance was exhausted by Davis in keeping up margins in gambling transactions, the set-off will not avail the defendants. A man cannot recover back money which he loses in gambling transactions any more than he can enforce a gambling contract.

If you find that the plaintiffs are entitled to recover from the defendant, then it will be in your discretion to allow the plaintiffs interest. If you think, under all the circumstances, they are entitled to interest on all sums advanced for Irwin & Davis, it is in your discretion to allow interest or not.

Verdict for plaintiffs for $17,622.78.
[The above judgment was reversed, and a new trial ordered, by the supreme court, where it was carried on writ of error. 110 U. S. 499, 4 Sup. Ct. 160.]
Consult also Jackson v. Foote [12 Fed. 37], and reporter's note thereto.