HAVEN & CLEMENT v. JAMES.

(Circuit Court, N. D. Georgia, W. D.   August 12, 1909.)

1. GAMING (§ 12*)—WAGERING CONTRACTS—SALE OF COTTON FOR FUTURE DE-
   LIVERY.

   A contract for the purchase or sale of cotton for future delivery on the New York Cotton Exchange, made subject to the rules and by-laws of the exchange, which provide that actual delivery of the cotton shall be contemplated by such contracts and may be required thereunder, is valid, and not illegal as a wagering contract.

   [Ed. Note.—For other cases, see Gaming, Cent. Dig. § 22; Dec. Dig. § 12.*]

2. GAMING (§ 12*)—PURCHASE OR SALE OF COMMODITY ON EXCHANGE—MODE
   OF SETTLEMENT.

   The fact that a contract for the purchase or sale of cotton on an exchange for future delivery, made by a broker in his own name, but on behalf of a customer, is settled between the brokers by setting it off against other contracts, or "rung out," as permitted by the rules of the exchange, does not extinguish it, or render it invalid as between the broker and his customer, who had knowledge of such rules.

   [Ed. Note.—For other cases, see Gaming, Cent. Dig. § 22; Dec. Dig. § 12.*]

At Law. On motion by defendant for new trial.

Brown & Randolph and Spencer R. Atkinson, for plaintiffs.
Smith, Hammond & Smith and C. E. Battle, for defendant.

NEWMAN, District Judge. This case having been tried by the court with a jury, and a verdict having been rendered in favor of the plaintiffs, the defendant made a motion for new trial, and the present hearing is on that motion.

The suit was brought by Haven & Clement against D. W. James for $10,145, "for work and labor done, services rendered, and money paid out and expended by said plaintiffs during the months of October, November, and December, 1904, at the instance and request of the defendant," which amount it is alleged the defendant afterwards, in consideration of the premises, promised to pay the plaintiff upon request. Plaintiffs were engaged in buying cotton on the New York Cotton Exchange, and the amount stated is claimed to be due by the defendant to the plaintiffs on account of transactions between them.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

It is alleged that they were employed by James, at various times named in the declaration, to buy and sell cotton in accordance with his desires. It is further alleged that plaintiffs—

"being at said time (referring to the dates mentioned in the declaration) brokers engaged in the buying and selling of cotton for a commission, they made said several purchases and sales of cotton for and at the request of the said defendant at the prices respectively authorized by him, and at his instance and request entered into binding contracts of purchase and sale for future delivery at the times aforesaid, in accordance with the rules and by-laws of the New York Cotton Exchange, for all of the cotton so purchased and sold; and plaintiffs further show, as members of the New York Cotton Exchange, that parties from and to whom said purchases and sales were made did not and do not know the said defendant, but look solely to the plaintiffs for a compliance with said contracts of purchase and sale, and hold your petitioners liable, bound for due compliance therewith."

It is then alleged that the defendant well knew that the plaintiffs were to make, and did make, said purchases and sales under and subject to the rules and by-laws of the New York Cotton Exchange, and were held personally bound for carrying out contracts in accordance with the rules and by-laws of the exchange. They allege that they advised the defendant that the several purchases and sales of cotton were made for his account and in accordance with his instructions, subject to the rules and by-laws of the New York Cotton Exchange; and that:

"Said orders for the purchase and sale of cotton for future delivery were received and executed with the distinct understanding that actual delivery was contemplated as provided by the rules of said exchange, all of which was well known to the defendant."

It is further alleged that:

"After said purchases and sales of cotton were made, as hereinbefore charged by them, for the said defendant, at his instance and request, for future delivery at the times aforesaid, cotton declined or advanced, as will appear from the bill of particulars attached to the original declaration, until the loss in the purchases and sales amounted to the sum of $9,280, which sum plaintiffs were bound to make good and pay, and which they did make good and paid to those from whom said cotton was bought or sold as the case may be, all of which was done for the benefit and at the instance and request of the said defendant."

It is then alleged that the defendant promised to remit upon request and to place in the hands of plaintiffs a sufficient sum to protect the plaintiffs, but that he failed in this respect—that is, in the sum of $9,280 mentioned—and thereby became indebted to them in that sum. It is then alleged that the defendant is indebted to plaintiffs (in addition to the $9,280) for commissions for services rendered by them, in the sum of $840 for work done and services rendered, said commissions being based upon the rules of the New York Cotton Exchange; that it was well known to the defendant, and under the rules of said exchange, plaintiffs were entitled to $7.50 for 100 bales of cotton bought or sold—the commissions for the same 100 bales bought and sold being the sum of $15. They allege that the defendant is indebted to them in the sum of $25, being collection charges charged and paid by plaintiffs upon certain checks remitted to plaintiffs by defendant in checks drawn on banks in the state of

Georgia; said collection charges being paid by plaintiffs for collecting these checks through their bank in New York. They allege they are entitled to interest at the rate of 6 per cent.

To this declaration a demurrer was filed, which was overruled. An answer was then filed. Defendant denied liability upon various grounds. Defendant denied that he had any transactions with the plaintiffs in the purchase and sale of cotton, except in the purchase and sale of cotton futures. He denies that certain advances which—

"plaintiffs claim were made by them, were made by the direction and request of defendant, or with his knowledge and consent, but were voluntary acts of plaintiffs, for which they have no right to hold defendant liable, and for which he denies any and all liability."

By an amendment to the answer the defendant says that no purchase and sales of actual cotton were contemplated by either party to the transaction, or were made, or intended to be made; that it was fully understood between the parties that the purchases and sales were simply purchases and sales of futures, and were only wagers dependent on the course of the fluctuations of futures and to the variations of the price thereof; that no actual cotton was bought, sold, or delivered, or received by plaintiff, in connection with any of the alleged transactions described in the complaint; that the deliveries or receipts of cotton which the plaintiffs may claim to have made, or which may have been made in the plaintiff's books, were not genuine or bona fide deliveries or receipts of cotton, but were in fact known and understood by both plaintiffs and defendant, and by any other persons, firms, or corporations with whom the plaintiffs may have dealt, or pretended to deal, to be merely fictitious transactions, not involving the delivery or receipt of any actual cotton; that these contracts were in violation of certain statutes in New York against betting and wagering; that the New York Cotton Exchange was not a market or exchange for dealing in any actual cotton, or for the purchase, sale, or delivery of any actual cotton, and that it was well known to both the plaintiffs and the defendant that said exchange was not such an exchange or market for the dealing in actual cotton, but was an agency solely for the purpose of wagering money upon the fluctuations of prices of futures, which prices in themselves were fictitious, and not in accordance with the contemporaneous price at which actual cotton was or could be bought for actual delivery in any market; that at the times mentioned in the complaint the New York Cotton Exchange maintained, through its rules and through the action of its classification committee, a fictitious and arbitrary classification of cotton, upon an arbitrary and uncommercial table of differences, providing grade, premiums, and discounts not in accordance with the actual differences of grade recognized by dealers in or users of actual cotton; that at the times mentioned in the complaint there was at the port of New York, and within reach thereof for the purpose of delivery under contracts, only a very small quantity of cotton in comparison with the amount of apparent dealings upon said exchange within the time referred to, and an amount totally inadequate for the fulfilment of the contracts made on said exchange, had the same been bona fide; that all the foregoing facts show the lack of intent to deal

in, and the difficulty or impossibility of dealing in, actual cotton on the floor of the exchange as a legitimate business proposition, or in any wise to deal therein, except for the purposes of and as gambling transactions, and were at all times mentioned in the complaint and for a long time prior thereto well known to plaintiffs and to all persons with whom any transactions or pretended transactions were had.

The answer further sets up that if the plaintiffs actually made any real or pretended transactions for the defendant, as alleged in their complaint, then they, the said plaintiffs, claiming to act under certain by-laws, rules, regulations. and customs of the said exchange, on or after the date of the said initial transactions set forth in their said complaint, and prior, respectively, to the second or "closing out" transactions, and before the defendant gave any orders for such closing out (if any in fact were given), offset, closed out, "rang out," settled on differences, and canceled the said original transactions or "contracts," as they are called upon the said exchange, and each of them, and thereby released all parties thereto, so that the defendant's rights arising by virtue thereof were canceled and utterly destroyed; that such offsetting, closing out, "ringing out," settling upon differences, and cancellation was done and had without notice to or the knowledge of defendant and against and in violation of his rights in the premises; that the defendant had no knowledge or notice of the by-laws, rules, regulations or customs of the said exchange under which plaintiffs pretend and claim to have acted or of any right or authority claimed by them so to offset, close out, "ring out," settle on differences, or cancel the said transactions or "contracts"; that the said by-laws, rules, regulations, and customs which are claimed to authorize the same are wholly unreasonable and unlawful, and at all times have been utterly void as against this defendant, and of no binding force, and effect upon him; that the losses, if any, made, occasioned, or paid upon, as well as any other payments made upon such offsettings, closing out, "ringing out" on differences, or cancellation, were not made, occasioned, or paid by virtue of any authority of the defendant, or by virtue of any right of the plaintiffs against him, or otherwise, in the premises, nor is he in any way responsible therefor, nor do they, or any matters or things growing out of the same, in any way fix or determine his liability to the plaintiffs, if any, nor are they binding upon him, nor do they give rise to any cause of action against him; that by such action the plaintiffs violated and abandoned their agency, to the total exclusion of any right to recover any sums whatever claimed in their complaint, or otherwise, from this defendant, because of any of the transactions or accounts in said complaint mentioned.

On the issue thus made the case went to trial before a jury. A considerable amount of evidence was offered by both parties. The plaintiffs offered evidence tending to establish their claim as to the various items named in the declaration and aggregating the sum claimed. No contest whatever was made, as the court understood it, over the amount of the plaintiffs' claim; the whole contest being over the validity and legality of the transactions, the defendant claiming that it was a mere wagering agreement and that he was not liable for that reason. There was some evidence which tended to show explicitly

that the defendant dealt in actual cotton. A telegram of November 25, 1904, from the defendant to the plaintiff was as follows:

"What is the last day for tendering December cotton? Can tender Tuesday."

And a letter from the defendant to Mr. Sterrett Tate, agent of the plaintiffs, as follows:

."Your telegram received late this afternoon. The wires here have been so very busy that the operator could not get in at all. It was 3 o'clock before I heard a line from you to-day. A large block of the cotton that your house carried for me was for other parties, and I have the cotton receipts as collateral. I will get the matter all straight next week. Say to your people to rest easy, as the thing broke worse to-day than any of us were looking for. Your house should not lose a dollar, though, if it was double the amount. Thanking you for your kindness in the matter."

There was evidence to show that the defendant bought and sold actual cotton, having a warehouse at his place of business in Blakely, Ga. Certain slips, being memoranda of purchases and sales made by plaintiffs on account of defendant as set out in the declaration, are offered in evidence. Telegrams in cipher and letters from the plaintiff to defendant indicate purchases or sales according to the transactions.

Mr. Haven, one of the plaintiffs, after identifying the various telegrams and letters, made the following statement:

"The total amount of gain which Mr. James made upon the purchases and sales is $4,820. The total amount of losses which he made upon these sales is $24,100. The total amount of Mr. James' net loss upon the entire transaction, after deducting his profits, is $19,280. We received from Mr. James on account of these matters on November 5, 1904, $5,000; December 5th, $5,000. Deducting these amounts from the net losses leaves $9,280 due. The total amount of our commissions is $840. Another charge against Mr. James for these two $5,000 checks there, is $25 collection charges. That makes the total amount of the claim $10,145. That was December 5, 1904. Referring to the loss of $19,280 on account of these transactions, as to how that matter taken care of by my firm—well, we have paid the money out on those contracts. We paid out $24,100, and took in $4,800 and also took in $10,000, that Mr. James paid. We paid out this amount of loss, $24,000, because we were liable on these contracts."

This is not denied in any way, as I gather from the evidence. The defendant offered evidence for the purpose of showing that the entire transactions between the defendant and the plaintiffs constituted an agreement for wagering on the fluctuations in the price of cotton, and that the claims made by the plaintiffs on the defendant were invalid for this reason. There were some minor items of defense, as stated, which were referred to in the charge; but the main defense in the case was on the ground that it was wholly a gambling transaction.

After argument, the case was submitted to the jury with the following instructions from the court:

"The first proposition that I submit to you in connection with the law of this case is this: That under the law, as settled now by the highest authority for us, the Supreme Court of the United States, these contracts made in the New York Cotton Exchange are valid and binding, when they are put in writing by slips of the character introduced in evidence here. The Supreme Court has held distinctly that they are sufficient memoranda in writing to bind the parties—to make a good contract between the parties to these slips. These contracts for the future delivery of cotton are sustained upon the ground

that under the law of New York, under the charter of the New York Cotton Exchange, and under the contracts, the delivery of the cotton—the actual cotton—can be required. Therefore these contracts are sustained as valid sales of a commodity, if the commodity is demanded by the purchaser. Now it is incumbent upon the plaintiffs in this case—that is, up to this point in the case, the plaintiffs have the burden upon them of showing you that a contract such as I have described was made by them in this form for Mr. James, the defendant.

"It is claimed by the defendant that what is called 'ringing out' extinguished these contracts that were made by Haven & Clement for Mr. James; that when the ringing out was made, and the matter carried through, that all these contracts which they had made for Mr. James were thereby extinguished. It is claimed on the part of the plaintiff that this is not true. They say that the contracts provided that they should remain in force until they were finally executed, notwithstanding this arrangement; that the contract to deliver on the part of any particular broker who sold to Haven & Clement, or their contract if they sold, existed and could have been enforced under the rules of the exchange, notwithstanding these contracts had, as they called it, been 'rung out.' This is a matter for you to determine from the evidence. I do not express any opinion, but leave it for you to say if the contracts had been extinguished by this 'ringing out,' if any existed, between Haven & Clement and the other brokers. Then, if the basis upon which the validity of the contracts rested was gone, of course, if the contract was ended which provided for the actual delivery of the cotton, and which could have been enforced, if that was gone and extinguished, the basis upon which the contract rested, of course, would go with it; that is, the right to demand the actual delivery of the cotton. So, in my judgment, if that was the effect of it, the plaintiff would not be entitled to recover, because the validity of the contract would be gone, for the reason stated. It is for you to determine. If you believe there still existed the right to demand the delivery of the cotton, then you will pass to some other points of defense in this case, which are set up by the defendant.

"It is next claimed by the defendant that the evidence shows that Mr. James and the plaintiffs' representative, Mr. Tate, had an express understanding that this arrangement made by Mr. James with the plaintiff firm was a mere wagering arrangement, and that both parties so understood it. If what he says about that— He told you about that on the stand; that there was to be no delivery of cotton; that is, it was simply taking—I do not remember the exact expression he used—a 'flier' or something like that, but you will remember what he said, and that Mr. Tate so understood, that he told Mr. Tate about that. And you heard what Mr. Tate said. He denied it. If there was an agreement between Mr. Tate and Mr. James, and if Mr. Tate was to do the business as he described it, and if he had authority to make this sort of an agreement, of course these contracts would fail, and could not be enforced at all. If the arrangement Tate had with James was that it was to be a mere wagering contract, and no delivery contemplated at all, the contracts could not be sustained. That is for you to say. But my understanding of Mr. James was upon the line indicated by me heretofore—that Mr. James wanted Mr. Tate to understand that 'this thing I am to do with you has nothing to do with my business at Blakely; it is entirely separate and distinct.' Of course, he may have intended it differently; but that is the impression I got. If you understood it differently, and if you believe they had the understanding here claimed by the defendant and his counsel, it would render these contracts invalid.

"The defendant also claims, as I understand it, that when these contracts were closed out on December 3d, he was allowed to go beyond his margin. As I get the idea from the defendant, he states that he had an arrangement with Mr. Tate that he was never to allow him to go beyond his margin, and that when his margin which he had put up with them was exhausted, they were to notify him, and if he did not increase it they were to close him out, and that by allowing him to go beyond his margin he was injured. Of course, if they failed to comply with his instructions to the extent that he was injured by their holding it contrary to his instructions, they ought not to recover against him. You heard the claim about the $5,000, about there being a mis-

apprehension about a check for $5,000 being on the way, or something of that kind. That is another defense for you to pass upon, as you believe about the evidence. Of course, if Mr. James gave Mr. Tate instructions to close him out as soon as his margin was exhausted, unless they heard from him, they should have done it, and to the extent to which he was injured by that there ought not to be any recovery against him. Mr. Tate testified, as I understand, the contrary, and also explained another matter; that is, that sometimes the market fluctuates so rapidly that it was simply impossible to do that. That is a matter for you to consider.

"Now you take this case, gentlemen, and apply the evidence to it. There is a large amount of evidence, some documentary, these depositions, and some oral evidence. Give it all fair consideration, and, as you believe about this case, so find. I believe the four points to which I have called attention are the controlling points, and if you are satisfied, under the instructions that I have given, that the plaintiffs are entitled to recover, find a verdict in their favor for the amount that I believe there is no dispute about, $10,125. This is contained in some of the papers there which will be given you."

I think the charge fairly presented the issues in the case to the jury. It was brief; but the case had been elaborately and thoroughly presented to the jury in evidence and argument, so that they understood fully the issues upon which the case turned. According to my understanding there has been no doubt of the validity of the contracts made for the purchase and sale of cotton on the New York Cotton Exchange under the charter, by-laws, rules, and regulations of the exchange, since the decision by the Supreme Court in Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819. In that case, in the opinion by Mr. Justice Jackson, it is said:

"Upon the third assignment of error, which presents the question whether the transactions in which the parties were engaged were illegal, because they were wagering contracts, under the New York statute against wagers, bets, etc., the evidence in the case clearly fails to make out such a defense. In entering into their arrangement, it is shown by the correspondence and by other testimony in the case that there was no agreement or understanding between the plaintiffs and defendants that the cotton sold for future delivery was not in fact to be actually delivered. In their correspondence as to the terms on which the agency was to be undertaken the plaintiffs were distinctly informed that the defendants did a large business for the best and most reliable people of their locality; that they would hold themselves personally responsible for all orders sent, and hold their correspondents responsible for all orders executed as to margins; that they handled sometimes from 3,000 to 5,000 bales of cotton a day, and that their customers dealt in orders for from 500 to 1,000 bales at a time, and were entirely responsible. It was also testified by both the plaintiffs and defendant Bibb that there was no understanding or agreement, either express or implied, between them, at the time of entering upon the transactions or during their progress, that the cotton sold for account of the principals was not to be delivered at the time stipulated in the contracts of sale made for their account. It is not questioned that, if the transactions in which the parties are engaged are illegal, the agent cannot recover, either commissions for services rendered therein or for advances and disbursements by him for his principal (Story on Agency, §§ 330, 344, and authorities cited); the reason for this rule being that in such illegal transactions, of which the agent has knowledge, he is regarded as particeps criminis, which precludes him from the recovery of either commissions or advances. Irwin v. Williar, 110 U. S. 499, 510, 4 Sup. Ct. 160, 28 L. Ed. 225.

"But the facts of this case do not bring the transactions in question within the operation of that principle; for the evidence set out in the bill of exceptions fails to show that either party to the transactions intended the same as wagering or gambling speculations. On the contrary, the undisputed testimony establishes that the sales were not wagers, but that the cotton was to be actually delivered at the time agreed upon. Bibb's own statement of the

transactions does not disclose the fact that they were intended, even on his part, as gambling or wagering speculations. He certainly never disclosed to the plaintiffs, as his brokers, either in their correspondence or in their verbal communications, that he did not intend to deliver the cotton sold through them for future delivery. In addition to this, it is shown that the rules and regulations impose upon the seller the obligation to deliver the cotton sold, and upon the purchaser the obligation to receive it, except in certain specified cases, which have no application to the present case. These rules, which were authorized to be made by the statute of the state of New York, under which the exchange was incorporated, enter into and form part of the contracts of sale in this case. The defendants, in one of their earliest communications to the plaintiffs, informed them that they would use in their telegraphic correspondence what was known as 'Shepperson's Code,' which provided that, 'unless otherwise stated as agreed, it is distinctly understood that all orders sent by this chapter are to be subject in every respect to the by-laws and rules of the market where executed,' and, further, 'that with every telegram sent by this table the following sentence will be read as a part of the message, viz.: This sale has been made subject to all the by-laws and rules of our Cotton Exchange in reference to contracts for the future delivery of cotton.'"

The contracts in question in this case were evidenced by a slip, such as are referred to in the opinion in Bibb v. Allen, and the cipher code known as "Shepperson's Code" was used in connection with the transactions, in that case as in this. Mr. Justice Jackson distinguishes Bibb v. Allen from Irwin v. Williar, 110 U. S. 499, 4 Sup. Ct. 160, 28 L. Ed. 225, which is strongly relied upon by defendant in this case.

In Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183, in the opinion by Mr. Justice Peckham, this is said:

"In Irwin v. Williar, 110 U. S. 499, 507, 4 Sup. Ct. 160, 28 L. Ed. 225, the trial judge in substance charged the jury that the burden of showing that the parties were carrying on a wagering contract and were not engaged in legitimate trade or speculation rests upon the defendant. Contracts for the future delivery of merchandise or stock are not void, whether such property is in existence in the hands of the seller or to be subsequently acquired. On their face these transactions are legal, and the law does not, in the absence of proof, presume that the parties are gambling. The proof must show that there was a mutual understanding that the transaction was to be a mere settlement of differences; in other words, a mere wagering contract. This charge was approved by this court, and the principle was again approved in Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819, supra."

In the present case, the court instructed the jury that:

If "there was an agreement made between Mr. Tate and Mr. James, and if Mr. Tate was to do the business as he described it, and if he had authority to make this sort of an agreement, of course, these contracts would fail, and could not be enforced at all. If the arrangement Tate had with James was that it was to be a mere wagering contract, and no delivery contemplated at all, the contract could not be sustained."

The instructions of the court seem to me to follow the rule thus laid down in Clews v. Jamieson, supra.

The last decision on this subject by the Supreme Court is Board of Trade v. Christie Grain & Stock Company, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, Mr. Justice Holmes, in delivering the opinion of the court, says:

"It appears that in not less than three-quarters of the transactions in the grain pit there is no physical handing over of any grain, but that there is a settlement, either by the direct method, so called, or by what is known as 'ringing up.' The direct method consists simply in setting off contracts to buy wheat

of a certain amount at a certain time against contracts to sell a like amount at the same time, and paying the difference of price in cash, at the end of the business day. The ring settlement is reached by a comparison of books among the clerks of the members buying and selling in the pit, and picking out a series of transactions which begins and ends with dealings which can be set against each other by eliminating those between—as, if A. has sold to B. 5,000 bushels of May wheat, and B. has sold the same amount to C., and C. to D., and D. to A. Substituting D. for B. by novation, A.'s sale can be set against his purchase, on simply paying the difference in price. The Circuit Court of Appeals for the Eighth Circuit took the defendant's view of these facts and ordered the bill to be dismissed. 125 Fed. 161, 61 C. C. A. 11. The Circuit Court of Appeals for the Seventh Circuit declined to follow this decision and granted an injunction as prayed. 130 Fed. 507, 64 C. C. A. 669, 69 L. R. A. 59. Thereupon writs of certiorari were granted by this court and both cases are here.

"As has appeared, the plaintiff's Chamber of Commerce is, in the first place, a great market, where, through its 1,800 members, is transacted a large part of the grain and provision business of the world. Of course, in a modern market, contracts are not confined to sales for immediate delivery. People will endeavor to forecast the future and to make agreements according to their prophecy. Speculation of this kind by competent men is the self-adjustment of society to the probable. Its value is well known as a means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want. It is true that the success of the strong induces imitation by the weak, and that incompetent persons bring themselves to ruin by undertaking to speculate in their turn. But Legislatures and courts generally have recognized that the natural evolutions of a complex society are to be touched only with a very cautious hand, and that such coarse attempts at a remedy for the waste incident to every social function as a simple prohibition and laws to stop its being are harmful and vain. This court has upheld sales of stock for future delivery and the substitution of parties provided for by the rules of the Chicago Stock Exchange. Clews v. Jamieson, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183."

And again in the opinion, as pertinent to this case:

"But, again, contracts made in the pit are contracts between the members. We must suppose that from the beginning, as now, if a member had a contract with another member to buy a certain amount of wheat at a certain time and another to sell the same amount at the same time, it would be deemed unnecessary to exchange warehouse receipts. We must suppose that then, as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. Set-off has all the effects of delivery. The ring settlement is simply a more complex case of the same kind. These settlements would be frequent, as the number of persons buying and selling was comparatively small.

"The fact that contracts are satisfied in this way by set-off and the payment of differences detracts in no degree from the good faith of the parties, and if the parties know when they make such contracts that they are very likely to have a chance to satisfy them in that way, and intend to make use of it, that fact is perfectly consistent with a serious business purpose and an intent that the contract shall mean what it says. There is no doubt, from the rules of the Board of Trade or the evidence, that the contracts made between the members are intended and supposed to be binding in manner and form as they are made. There is no doubt that a large part of those contracts is made for serious business purposes. Hedging, for instance, as it is called, is a means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture. It is none the less a serious business con-

tract for a legitimate and useful purpose that it may be offset before the time of delivery in case delivery should not be needed or desired."

A still further extract, which appears to bear upon the question now under consideration, is as follows:

"In the view which we take, the proportion of the dealings in the pit which are settled in this way throws no light on the question of the proportion of serious dealings for legitimate business purposes to those which fairly can be classed as wagers or pretended contracts. No more does the fact that the contracts thus disposed of call for many times the total receipts of grain in Chicago. The fact that they can be and are set off sufficiently explains the possibility, which is no more wonderful than the enormous disproportion between the currency of the country and contracts for the payment of money, many of which in like manner are set off in clearing houses without any one dreaming that they are not paid, and for the rest of which the same money suffices in succession; the less being needed the more rapid the circulation is."

On the trial of the present case the question as to whether the "ringing out" extinguished these contracts was submitted to the jury, as is shown by the charge. I thought on the trial that this was the proper course, and still think so. The jury necessarily found the issue against the defendant. When the contracts for the sales of cotton were "rung out," as related in the evidence, and Haven & Clement were thereby left liable to James on the contract, I do not think the effect was, as contended, to render the contracts invalid and relieve James from the indebtedness. This is fully established by decisions of the Supreme Court and of the Circuit Court. The latest decisions on this subject are Clews v. Jamieson, supra, and Board of Trade v. Christie Grain & Stock Company, supra. See, also, on this question, Clarke v. Foss, 5 Fed. Cas. 955; Williar v. Irwin, 30 Fed. Cas. 38; Ward v. Vosburgh (C. C.) 31 Fed. 15; Pardridge v. Cutler, 68 Ill. App. 569–579; Irwin v. Williar, 110 U. S. 507, 4 Sup. Ct. 160, 28 L. Ed. 225; Higgins v. McCrea, 116 U. S. 671, 6 Sup. Ct. 557, 29 L. Ed. 764; and Hansen v. Boyd, 161 U. S. 403, 16 Sup. Ct. 571, 40 L. Ed. 746.

The only reason drawn from the authorities why this would not be true, so far as I can discover, is that James should be ignorant of the rules of the New York Cotton Exchange on this subject. There was evidence tending to establish the fact that he was fully acquainted with the rules of the exchange, and of such character that the jury might well have considered it sufficient to establish the fact.

The other minor matters referred to in the charge are peculiar to this case, and I think were fairly submitted to the jury.

It is claimed that a recent decision by the Circuit Court of Appeals for this (the Fifth) Circuit, in Williamson v. Majors (decided May 19, 1909) 169 Fed. 754, is an important authority in favor of the defendant, and in favor of granting a new trial. I do not think so. The opinion is by Circuit Judge Pardee. In the opinion Judge Pardee, among other things, says:

"There was much evidence bearing on the question as to whether the Memphis establishment, managed by Bettis Majors, was or not a bucket shop, and on the allegation that each and every order of Williamson to buy or sell cotton futures was executed on the exchange and strictly according to rule, and as to the impeccability of the rules of the New Orleans Cotton Exchange in

the matter of actual delivery of all products sold therein and thereon—as to all of which, and under our view of the other issues, no finding need be given here."

He then proceeds to quote from Embrey v. Jemison, 131 U. S. 343, 9 Sup. Ct. 776, 33 L. Ed. 172, and says:

"We find nothing in Bibb v. Allen, 149 U. S. 481, 13 Sup. Ct. 950, 37 L. Ed. 819, or in Board of Trade of the City of Chicago v. Christie Grain & Stock Co., 198 U. S. 236. 25 Sup. Ct. 637, 49 L. Ed. 1031, cited by appellee, nor in any other Supreme Court decision brought to our attention, in conflict with or even modifying Embrey v. Jemison, supra, and that case must influence the decision of the main issues in this case; but in view of the pleadings, and considering that the transactions complained of were in Tennessee, that the present case is now pending in the Circuit Court of the United States in Mississippi, and relief is asked under the laws of the last-named state, it is proper, if not necessary, to further consider the questions involved under Tennessee and Mississippi laws."

Judge Pardee then proceeds to discuss those laws. It is unnecessary to discuss the facts in that case, or the opinion of the court further. I do not think it means anything more than that the contracts between Williamson and Majors were mere wagering contracts on the facts appearing in the record, and it is not intended, of course, to differ with the decisions of the Supreme Court from which I have quoted.

As the jury were properly instructed as to the law of the case, and as the evidence is sufficient to support the verdict, I would not be justified in setting it aside. Consequently the motion for new trial must be denied.

For want of time I have not gone into the interesting questions raised in this case as fully as the exhaustive argument and briefs of counsel on both sides merit, but I have stated what I regard as the controlling reasons for deciding the motion as indicated.